**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, | Case No. 1:21-cv-06546 |
| Plaintiff / Counterclaim-Defendant, | The Honorable John R. Blakey |
| v. | |
| VINTAGE BRAND, LLC, and SPORTSWEAR INC. d/b/a PREP SPORTSWEAR, | |
| Defendant / Counterclaim-Plaintiff. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT VINTAGE BRAND, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ABANDONMENT OF THE UNIVERSITY'S "CHIEF" LOGO**

Defendant Vintage Brand, LLC ("Vintage Brand") hereby submits the following Memorandum of Law pursuant to Northern District of Illinois Rule 56.1(a) in support of its Motion for Partial Summary Judgment on abandonment of the University of Illinois' "Chief" Logo.

i

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................... 1

II. FACTUAL BACKGROUND ................................................................................... 2

    A.    The NCAA Pressures the University to Disclaim the "Use of Native American Imagery as the Symbol of the University." ............................................ 2

    B.    Vintage Brand Reasonably Relied Upon the University's Public Statements. ..................................................................................................... 4

    C.    The University Filed This Lawsuit Against Vintage Brand, Claiming Continued "Use" of the Chief Logo. ...................................................................... 4

    D.    Vintage Brand Discovers the University's Trademark Maintenance Program for the Chief Logo. .................................................................................. 4

        1.    The University Takes Steps to Hide Connections as the Source of the Chief Logo Goods. .................................................................................. 5

        2.    The University's Sales of Chief Logo Goods Are Token and Minimal. .... 6

III. AUTHORITY ......................................................................................................... 7

    A.    The Lanham Act Requires *Bona Fide*, Public, Source-Indicative Use of Trademarks. .................................................................................................. 8

    B.    The University Announced the Retirement of the Chief Logo Mark in 2007. ..................................................................................................... 8

    C.    The University Has Created a Furtive Trademark Maintenance Program Inconsistent with the Purposes of the Lanham Act. ................................ 9

    D.    The University's Trademark Maintenance Program Generates Only *De Minimis* Licensing Revenue and the University Has Made No Efforts to Expand Sales. ..................................................................................... 13

IV. CONCLUSION ..................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agler v. Westheimer Corp.*,
    143 F. Supp. 3d 766 (N.D. Ind. 2015) .................................................................. 8

*Allard Enter., Inc. v. Advanced Programming Res., Inc.*,
    146 F.3d 350 (6th Cir. 1998) ............................................................................... 8

*AmBrit, Inc. v. Kraft, Inc.*,
    812 F.2d 1531 (11th Cir. 1986) .......................................................................... 13

*Blue Bell, Inc. v. Farah Mfg. Co., Inc.*,
    508 F.2d 1260 (5th Cir. 1975) ............................................................................ 10

*Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*,
    991 F.2d 1316 (7th Cir. 1993) .............................................................................. 7

*Emergency One, Inc. v. Am. FireEagle, Ltd.*,
    228 F.3d 531 (4th Cir. 2000) .............................................................................. 10

*Exxon Corp. v. Humble Expl. Co.*,
    592 F. Supp. 1226 (N.D. Tex. 1984) ................................................................... 12

*Exxon Corp. v. Humble Expl. Co., Inc.*,
    695 F.2d 96 (5th Cir. 1983) ........................................................................... 12, 13

*Glow Indus., Inc. v. Lopez*,
    252 F. Supp. 2d 962 (C.D. Cal. 2002) ................................................................ 10

*Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.*,
    720 F.2d 981 (8th Cir. 1983) ................................................................................ 9

*Intrawest Fin. Corp. v. Western Nat. Bank of Denver*,
    610 F. Supp. 950 (D. Colo. 1985) ...................................................................... 13

*ITC Ltd. v. Punchgini, Inc.*,
    482 F.3d 135 (2d Cir. 2007) ................................................................................. 8

*La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*,
    495 F.2d 1265 (2d Cir. 1974) ........................................................................ 10, 11

*M. B. H. Enterprises, Inc. v. WOKY, Inc.*,
    633 F.2d 50 (7th Cir. 1980) ................................................................................ 10

*Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*,
290 F. Supp. 2d 1083 (C.D. Cal. 2003) ................................................................. 10

*MB Fin. Bank, N.A. v. MB Real Estate Servs., LLC*,
2003 WL 21462501 (N.D. Ill. June 23, 2003) .................................................... 8, 9

*Metro. Life Ins. Co. v. O'M & Assocs., LLC*,
2009 WL 3015210 (N.D. Ill. Sept. 16, 2009) ......................................................... 8

*Perry v. H. J. Heinz Co. Brands, LLC*,
994 F.3d 466 (5th Cir. 2021) ........................................................................ 13, 14

*Procter & Gamble Co. v. Johnson & Johnson, Inc.*,
485 F. Supp. 1185 (S.D.N.Y. 1979) ........................................................ 11, 12, 13

*S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*,
835 F.3d 660 (7th Cir. 2016) ................................................................................ 8

**Statutes**

15 U.S.C. § 1119 ....................................................................................................... 2

15 U.S.C. § 1127 .................................................................................................. 8, 10

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................. 7

**Other Authorities**

Adam Epstein & Bridget Niland, *Exploring Ethical Issues and Examples by Using Sport*, 13
ATLANTIC L.J. 19 (2011) ....................................................................................... 3

Kristen A. Carpenter et al., *In Defense of Property*, 118 YALE L.J. 1022 (2009) ......................... 3

Daniel McClurg, *Locker Room Politics: The Role of Sports Leagues in Shaping [Anti-]Social
Legislation*, 17 VA. SPORTS & ENT. L.J. 82 (2017) .................................................... 3

Nathaniel T. Noda, *Perpetuating Cultures: What Fan-Based Activities Can Teach Us About
Intangible Cultural Property*, 44 CREIGHTON L. REV. 429 (2011) ................................ 3

Laura Sigler, *The Saga Continues: The Redskins, Blackhorse, and the Future of Native American
Trademarks in Sports*, 62 WAYNE L. REV. 73 (2016) ................................................. 3

Jason Finkelstein, *What the Sioux Should Do: Lanham Act Challenges in the Post-Harjo Era*, 26 CARDOZO ARTS & ENT. L.J. 301 (2008) ........................................................................... 2

Spencer D. Kelly, *What's in a Name: The Controversy Surrounding the NCAA's Ban on College Nicknames and Mascots*, 5 WILLAMETTE SPORTS L.J. 17 (2008) ............................................... 3

André Douglas Pond Cummings & Seth E. Harper, *Wide Right: Why the NCAA's Policy on the American Indian Mascot Issue Misses the Mark*, 9 U. MD. L.J. RACE, RELIGION, GENDER & CLASS 135 (2009) ................................................................................................................... 3

# I. INTRODUCTION

The Lanham Act does not protect clandestine trademarks; trademark owners must have *bona fide* intent to *use* their marks in commerce as indicators of source. Token "use" aimed at merely reserving rights or excluding others is not enough. The Board of Trustees of the University of Illinois ("University") wants to reserve rights to a controversial logo purporting to depict "Chief Illiniwek," a symbol featuring a face wearing a Native American headdress ("Chief Logo"):



Yet the University has also been directed by its Board of Trustees and pressured by members of the public, the campus community, and the National Collegiate Athletic Association (NCAA), to stop using this imagery. The two opposing objectives cannot be reconciled.

The University nevertheless attempts to achieve this high-wire act. In response to mounting pressure, the University publicly announced its intention to discontinue use of Native American imagery in 2007. Unbeknownst to Vintage Brand and the public at large, however, the University continued to license the Chief Logo through a small-scale program limited to online-only sales, resulting in nominal revenue. While engaging in these token licensing activities, the University has made painstaking efforts to distance itself as the source of the Chief Logo-decorated items.

Such a blatant attempt to merely retain trademark rights to the Chief Logo does not constitute *bona fide* "use" demanded by the Lanham Act, and the University's intent not to resume actual "use" is plain from its public messaging since 2007. There is no issue of material fact regarding the University's improper trademark maintenance program, and no need for further factual findings regarding its intent to merely reserve rights in its mark.

Vintage Brand is entitled to judgment that the University has abandoned the Chief Logo, its Second Affirmative Defense and First Counterclaim, warranting dismissal of claims based on

1

these lapsed trademark rights as well as an order directing the USPTO to cancel U.S. Trademark Registration No. 2,232,024 (the "'024 Registration") pursuant to 15 U.S.C. § 1119. This motion should be granted.

## II.  FACTUAL BACKGROUND

### A.  The NCAA Pressures the University to Disclaim the "Use of Native American Imagery as the Symbol of the University."

Beginning in 2005, the NCAA adopted a policy "prohibit[ing] NCAA colleges and universities from displaying hostile and abusive racial/ethnic/national origin mascots, nicknames or imagery" at the NCAA championships. (SMF ¶ 1.) The NCAA identified the University as one of 18 universities displaying prohibited imagery, and the University's men's tennis team was consequently prohibited from hosting an NCAA championship event in 2006.[1] (*Id.* ¶ 2–4.)

In a meeting on March 13, 2007, the University approved a resolution by which it formally abandoned the Chief Illiniwek design: "the Board hereby directs the immediate conclusion to the use of Native American imagery *as the symbol of the University of Illinois* and its intercollegiate athletics along with the related regalia, logo, and the names "Chief Illiniwek" and "Chief." (*Id.* ¶ 5 (emphasis added).) Shortly following this Board directive, on March 30, 2007, the University and its licensee, the Collegiate Licensing Company ("CLC"), provided the following memorandum to University licensees:

> The Board of Trustees of the University of Illinois at Urbana-Champaign has recently made a decision to . . . eliminate or impose strict limitations on the use of Native American imagery as the symbol for the University of Illinois.
>
> Pursuant to the restricted program, CLC and the University will put retailers on notice that they may not order any additional merchandise featuring the Chief logo, or products featuring the terms "Chief" or "Chief Illiniwek" after Monday,

---

[1] Jason Finkelstein, *What the Sioux Should Do: Lanham Act Challenges in the Post-Harjo Era*, 26 CARDOZO ARTS & ENT. L.J. 301, 318 (2008) ("After losing its appeal to have its nickname removed from the 'hostile and abusive' list, the Illinois men's tennis team was prohibited from hosting the first round of the 2006 NCAA championships.").

April 16, 2007 . . . . **Please note that no wholesale merchandise will be approved for sale or distribution beyond December 31, 2007, regardless of when it was ordered.**

(*Id.* ¶ 6 (emphasis in original).)

As a result of the University's messaging, the University's 2007 abandonment of Chief Illiniwek as a symbol and its cessation of use of any related imagery, was and is well-recognized by the public.[2] (*Id.* ¶ 7.) Moreover, documented statements by University officials repeatedly publicized the University's discontinuation of the Chief Illiniwek design and its intention to make that discontinuation permanent. (*Id.* ¶ 8.) The University's creation of a public-facing Commission on Native Imagery with the goal of "healing" and "establishing new traditions," further cemented the University's public abandonment of the Chief Illiniwek design. (*Id.* ¶ 9; *see also* ¶ 8.g (Chancellor Jones statement: "[w]e've been very, very clear that those kinds of images are not part of this university").) The current "brand identity" of the University simply does not include the Chief Logo. (*Id.* ¶ 10.) Instead, per the University's branding guidelines, the University emphasizes its orange "I" logo and other highly standardized marks. (*Id.* ¶ 11.)

---

[2] *See* Daniel McClurg, *Locker Room Politics: The Role of Sports Leagues in Shaping [Anti-]Social Legislation*, 17 VA. SPORTS & ENT. L.J. 82, 87 (2017) (summarizing that the University "refused to change its mascot from 'Chief Illiniwek' until it was not permitted to host the 2006 NCAA Tennis Championships" and that "the NCAA policy effectively eliminated the use of discriminatory imagery aimed at Native Americans by its member institutions" (footnote omitted)); Laura Sigler, *The Saga Continues: The Redskins, Blackhorse, and the Future of Native American Trademarks in Sports*, 62 WAYNE L. REV. 73, 103 (2016) ("Illinois' Chief Illiniwek fell victim to the ban, and he was officially retired in 2007."); Nathaniel T. Noda, *Perpetuating Cultures: What Fan-Based Activities Can Teach Us About Intangible Cultural Property*, 44 CREIGHTON L. REV. 429, 437–38 (2011) (recognizing that the NCAA policy "led to the [U]niversity's retirement of the mascot" (footnote omitted)); Adam Epstein & Bridget Niland, *Exploring Ethical Issues and Examples by Using Sport*, 13 ATLANTIC L.J. 19, 44 (2011) (stating that the University "abandoned its use of *Chief Illiniwek* after the NCAA rejected its 2006 appeal"); Kristen A. Carpenter et al., *In Defense of Property*, 118 YALE L.J. 1022, 1106 (2009) (referring to "the decision of the University of Illinois to discontinue its use of Chief Illiniwek"); Spencer D. Kelly, *What's in a Name: The Controversy Surrounding the NCAA's Ban on College Nicknames and Mascots*, 5 WILLAMETTE SPORTS L.J. 17, 30 (2008) (noting that the University "decided to retire Chief Illiniwek"); André Douglas Pond Cummings & Seth E. Harper, *Wide Right: Why the NCAA's Policy on the American Indian Mascot Issue Misses the Mark*, 9 U. MD. L.J. RACE, RELIGION, GENDER & CLASS 135, 174 (2009) ("[T]he NCAA required that the [U]niversity not only retire Chief Illiniwek, but eliminate its logo . . .").

**B.    Vintage Brand Reasonably Relied Upon the University's Public Statements.**

Vintage Brand operates an online retail store through which it offers apparel, wall art, coasters, and other blank merchandise that can be customized with historic artistic images reproduced from vintage sports memorabilia. (*Id.* ¶ 12.) Vintage Brand acquired historic, public domain University memorabilia from collectors, including decals, matchbooks and buttons, and offered digitalized images drawn from those objects for decorative printing on apparel and other goods. (*Id.* ¶ 13.) On pages where the Chief Logo appears, Vintage Brand provides background on the symbol's history with the University, including its retirement. (*Id.* ¶ 14.) Additionally, there are three prominent disclaimers making clear that Vintage Brand is not affiliated with the University. (*Id.* ¶ 15.)

**C.    The University Filed This Lawsuit Against Vintage Brand, Claiming Continued "Use" of the Chief Logo.**

The University initiated this lawsuit on December 7, 2021, bringing claims against Vintage Brand for, among other things, infringement of the Chief Logo. (*Id.* ¶ 16.) Vintage Brand answered the University's complaint and brought counterclaims of its own, including for cancellation of the '024 Registration based on Vintage Brand's sincere belief that the University abandoned the Chief Logo in 2007. (*Id.* ¶ 17.) The University denied those claims. (*Id.* ¶¶ 18–19.)

**D.    Vintage Brand Discovers the University's Trademark Maintenance Program for the Chief Logo.**

Since fact discovery has commenced, the University has produced records that reveal its initiation of a small underground licensing program for the Chief Logo following the events of 2007. (*Id.* ¶ 20.) While the University *publicly* stated its intention to discontinue use of the Chief Logo, *internally*, the University was attempting to find a way to have its cake and eat it too; the University wanted to exclude others and reserve its rights to the Chief Logo, but without openly associating with Native American imagery.

4

To this end, the University and CLC released the following FAQs to its "[m]ore than 400" licensees, accompanying the memorandum issued on March 30, 2007:

> Q:    Why are you restricting the production of Chief merchandise?
>
> A:    The University of Illinois Board of Trustees issued a directive to discontinue use of "the use of Native American imagery as the symbol of the University of Illinois and its intercollegiate athletics along with related regalia, logo, and the names Chief Illiniwek and Chief."
> . . . .
> Q:    What will happen to the logo?
>
> A:    The campus is evaluating options that allow us to maintain trademark rights to the logo while implementing the Board's directive to 'end the use of Native American imagery as the symbol of the University of Illinois.' *Premature abandonment of trademarks effectively places them in the public domain and removes the control a university has to regulate their use. This has, in some instances, resulted in use of the abandoned marks by third parties who produce and sell products bearing the marks, while leaving the university/owner without legal recourse. Our best course in meeting the Board's directive is to maintain trademark rights to the logo, rather than abandon it.*

(*Id.* ¶ 21 (emphasis added).) The memo demonstrates that the University was strategizing ways to publicly abandon the Chief Logo while still reserving exclusive rights in the Chief Logo. (*See id.*)

### 1.    The University Takes Steps to Hide Connections as the Source of the Chief Logo Goods.

Away from the eyes of the public and Vintage Brand, the University schemed with the CLC to set up a "special licensing program under the College Vault umbrella for the verbiage 'Chief,' 'Chief Illiniwek,' and the Chief Illiniwek logo, [to] enable CLC to track Chief Illiniwek royalties separately from Illinois' standard royalties." (*Id.* ¶ 22.) Although in 2007, the University identified that it had more than 400 licensees, it has limited the special licensing program to around only *eight* licensees, and it has declined approval of additional licensees. (*Id.* ¶¶ 23–24). This intentionally small-scale program includes "guidelines" for those select few entities who are granted a limited license to print the Chief Logo. (*Id.* ¶ 25.) Among other criteria, the program prohibits any sales in brick and mortar stores. (*Id.*) Part of the rationale for the prohibition is that

it "restricts the products from being sold in the campus community." (*Id.* ¶ 26.)

Although the University acknowledges that exclusively online sales might be difficult for its licensees to implement, the backdrop for the University's prohibition ultimately boils down to: the Chief Logo is "just a REALLY sensitive topic with our University." (*Id.* ¶ 27.) To this end, the University rejected an idea proposed by the on-campus bookstore to install a computer kiosk to assist with ordering Chief Logo merchandise online, noting that some people on campus would "prefer that the Chief product isn't promoted at all." (*Id.* ¶¶ 28–29.)

Consistent with the University's goal of disassociating from the Chief Logo, it does not license any local companies to print the Chief Logo, nor does it allow students or University-affiliated groups to display the Chief Logo. (*Id.* ¶ 30.) The University also aggressively prohibits Chief Logo goods in brick and mortar stores and intentionally excludes Chief Logo products from promotions. (*Id.* ¶¶ 31–34, 39–40.) Additionally, the University prohibits the sale of Chief Logo products on its official online stores, such as <Fightingillini.com>. (*Id.* ¶ 38.) Thus, the University has gone to great lengths to keep an intentionally low-profile for its improper trademark maintenance program, contrary to source-indicative "use" demanded by trademark law.

## 2. The University's Sales of Chief Logo Goods Are Token and Minimal.

Unsurprisingly, the University has received some criticism from the community upon discoveries of Chief Logo merchandise, particularly where its own faculty, students, and alumni relied on the University's public statements that the Chief Logo had been retired. (*Id.* ¶ 46.) In reviewing these communications, in at least one instance, the University noted the minimal sales figures for Chief Logo merchandise:

> Here is some year-to-date information regarding overall Chief merchandise sales as compared to total sales of licensed products. Note that the amount of Chief items produced is actually down slightly from a year ago.
>
> July 2016 – April 2017 3,621 Chief units produced (out of 815,000 total) $7,100

royalties from Chief items out of $1.1 million

July 2015-April 2016 3,947 Chief units produced (out of 1,000,000 total) $7,900 royalties from Chief items out of $1.5 million

(*Id.* ¶¶ 42, 47.c) A royalty summary for apparel and items decorated with the Chief Logo shows that the total licensing revenue for this mark has historically been between 0.002%–0.6% from 2008–2017, ranging from $39 to $9,300 annually, compared to $1.2–2.1 million for the rest of the University's licensing activities. (*Id.* ¶ 43.)

## III.  AUTHORITY

Summary judgment is appropriate where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In response, the nonmoving party must identify specific facts to establish there is a genuine triable issue. *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993). The University will be unable to do so here. The facts cited to support Vintage Brand's entitlement to judgment as a matter of law are based on the University's own representations regarding its use of the Chief Logo and drawn from the University's own production.

The University wants to exclude others from using the Chief Logo image, but also wants to publicly disassociate itself from being the source of any goods sold under the Chief Logo. It cannot have it both ways. The University's "special," extremely limited licensing program does not represent *bona fide* use as a source-indicator, or intent to resume *bona fide* use, for at least three reasons: (1) the University announced the retirement of the Chief Logo; (2) the University's trademark maintenance program is inconsistent with the language and purposes of the Lanham Act; and (3) the program has only nominal sales with no efforts at growth.

The University's lack of *bona fide* use as a source-indicator amounts to non-use under the law. And because the University ceased public association with the Chief Logo in 2007 with no

7

intent to resume *bona fide* use, it has abandoned whatever trademark rights it had, and that image has fallen into the public domain. Vintage Brand's motion should be granted, and the Court should dismiss claims related to the Chief Logo and cancel the '024 Registration.

**A.      The Lanham Act Requires *Bona Fide*, Public, Source-Indicative Use of Trademarks.**

The Lanham Act provides that a mark shall be deemed to be "abandoned" when "its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. "Once abandoned, a mark returns to the public domain and may, in principle, be appropriated for use by other actors in the marketplace[.]" *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007) (internal citations omitted). The party asserting abandonment must show (1) non-use of the mark, and (2) intent not to resume use of the mark. *Agler v. Westheimer Corp.*, 143 F. Supp. 3d 766, 772 (N.D. Ind. 2015). "Use' of a mark means the *bona fide use* of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127 (emphasis added).

Residual, token uses of a mark "merely to prevent others from using the mark, are not *bona fide* uses under the Lanham Act." *Metro. Life Ins. Co. v. O'M & Assocs., LLC*, 2009 WL 3015210, at *3 (N.D. Ill. Sept. 16, 2009) (quoting *MB Fin. Bank, N.A. v. MB Real Estate Servs., LLC*, 2003 WL 21462501, at *9–11 (N.D. Ill. June 23, 2003)) (finding abandonment following internal orders to cease use of mark). Trademark rights are not established from registration or claims of ownership—instead, the ability to exclude others from using a mark arises only from "actual use in the market," i.e., *bona fide* use in commerce as an indication of source. *S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660, 665 (7th Cir. 2016) (quoting *Allard Enter., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 356 (6th Cir. 1998)).

**B.      The University Announced the Retirement of the Chief Logo Mark in 2007.**

The University's public announcements, including a formal resolution, regarding discontinuing the Chief Logo "as the symbol of the University of Illinois" (SMF ¶ 5) belie any

argument that the University has engaged in *bona fide* use of the design since 2007. For example, in *MB Financial Bank, N.A. v. MB Real Estate Services, LLC*, a bank underwent a re-branding and issued a memo instructing employees to remove all items with an old mark. 2003 WL 21462501, at *8. The court observed that "[a]n announcement that a mark will not be used in the future is strong evidence of an intent to abandon a mark." *Id.* (citing *Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.*, 720 F.2d 981, 983 (8th Cir. 1983)). The court also reasoned that the bank's residual uses of its old mark on checks and payment cards did not constitute a protectible use under the Lanham Act where the bank's public efforts "eliminated any goodwill or identification function previously served by the old marks." *Id.* at *8–11 (holding that the old mark had been abandoned).

The same is true here. The University's well-publicized retirement of the Chief Logo in 2007 contradicts the notion that any subsequent "use" by the University is *bona fide* or creates protectible rights. Specifically, starting in 2007, the University publicly disclaimed association with Native American imagery, and it has repeatedly communicated to the public that it has stopped using the Chief Logo as a University symbol. (SMF ¶¶ 5–8.) The University also invested its resources into its re-branding under marks such as the "I Logo," (*id.* ¶ 11), and the Chief Logo cannot be found anywhere in the University's detailed "Brand Identity Guidelines." (*Id.* ¶ 10.) The University's public efforts cut against any notion that the University's underground licensing, *see infra* Parts.III.C–D, averts its abandonment of rights to the Chief Logo.

## C. The University Has Created a Furtive Trademark Maintenance Program Inconsistent with the Purposes of the Lanham Act.

The University wants to reserve rights and keep others from using the Chief Logo, but its own Board of Trustees has directed an end to the use of Native American imagery as a symbol for the University. To navigate this contradiction, the University designed a special program to sit on the Chief Logo into perpetuity, despite having no plans to ever promote the association of the Chief

9

Logo with the University. Such an intentional public separation of the mark from the source, combined with an indefinite retention of supposed rights, is contrary to the purpose of the Lanham Act and provides no protectable interest.

The purpose of a trademark is "simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his." *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974). Under the Lanham Act, "[b]oth 'use' and 'intent not to resume such use' have somewhat specialized meanings.'" *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000) (citing 15 U.S.C § 1127). Courts require "use" to be "sufficiently public" so that the goods are "identified or distinguished in an appropriate segment of the public mind as those of the [trademark owner]." *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1088 (C.D. Cal. 2003) (quoting *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 981 (C.D. Cal. 2002)); *see also Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1265 (5th Cir. 1975) ("Secret, undisclosed internal shipments are generally inadequate to support the denomination 'use.'") (collecting cases). Put another way, a design is "used" for purposes of the Lanham Act when it is "used by a source of [products] *to identify itself to the public as the source* of its [products] and to create in the public consciousness an awareness of the uniqueness of the source and of its [products]." *M. B. H. Enterprises, Inc. v. WOKY, Inc.*, 633 F.2d 50, 53–54 (7th Cir. 1980) (citing 15 U.S.C. § 1127) (emphasis added).

A trademark is intended to designate a source, but the University's "special" limited licensing program seeks to do precisely the opposite—to erase the University's connection to the goods sold. As such, the University's licensing of the Chief Logo must be seen for what it is: **an improper trademark maintenance program**. Other courts have considered such programs, and

found them contrary to the purpose of the Lanham Act. For example, in *Procter & Gamble Co. v. Johnson & Johnson, Inc.*, trademark owner P&G maintained a program intended to reserve its rights in a set of inactive brands called the "Minor Brands Program." 485 F. Supp. 1185, 1204 (S.D.N.Y. 1979). To enact the program, P&G's legal team circulated a memo noting that non-use of a mark for two years would result in its abandonment—to avoid this, P&G established the Minor Brands Program "to rebut any such inference of abandonment and thus maintain the company's ability to subsequently use the marks on goods in question as major brands." *Id*. Reviewing the Minor Brands Program list every year, a "trademark coordinator" was tasked with packing 50 units of each product and shipping them to at least 10 states. *Id*. None of P&G's catalogs, price lists or other published materials, however, referenced the minor brands, and "virtually none of P&G's personnel [was] aware of their existence." *Id*. at 1205.

Examining the Minor Brands Program, the court found that P&G had failed to put the three minor brands at issue "on the market in any meaningful way . . . [because] [t]here must [be] a trade in the goods sold under the mark or at least an **active** and **public** attempt to establish such a trade." *Id*. at 1206 (citing *La Societe Anonyme des Parfums le Galion*, 495 F.2d at 1272–74) (emphasis added). Finding that P&G's "use" of the three minor brands failed to qualify as "*bona fide* commercial use," the court concluded that it owned no enforceable rights to those marks. *Id*. at 1207; *see also La Societe Anonyme des Parfums le Galion*, 495 F.2d at 1272 ("[W]here no present intent has been found to market the trademarked product, minimal sales have been held insufficient to establish trademark rights.").

Such is the case here. The University has created an insular licensing program for the Chief Logo, entirely separate from its other licensing avenues. Like the internal memo circulated in *Procter & Gamble*, here the University announced it would evaluate "options that allow us to

maintain trademark rights to the logo while implementing the Board's directive to 'end the use of Native American imagery as the symbol of the University of Illinois.'" (SMF ¶ 21.) It is difficult to envision more concrete evidence of attempting minimal "use" of a trademark simply to reserve rights, contrasting with a *bona fide* intent to commercialize the brand.

The University's efforts to thread the needle of sitting on its rights to the Chief Logo while evading open, public use has led to its own campus community being unaware that it still licenses the Chief Logo. (*Id.* ¶ 46.) As was the case in *Procter & Gamble*, where the nominal trademark owner's own community is unaware of the existence of the "Minor Brands," the trademark "use" cannot be perceived as sufficiently public and source-identifying. 485 F. Supp. at 1205. As one University employee put it upon learning about the continued licensing of the Chief Logo, "[h]ow is the Chief Illiniwek College Vault Program not a way to circumvent the retirement of the Chief?" (SMF ¶ 46.d.) In response, the University professed that the program is "for several trademarks that are no longer current representations of our institution, but are part of its history." (*Id.* ¶ 47.a.) In other words, the University no longer uses the Chief Logo in any public way, much less a source-identifying, associative manner as Lanham Act "use" requires.

Further support for the conclusion that the University's trademark licensing program does not represent trademark "use" derives from *Exxon Corp. v. Humble Expl. Co., Inc.*, 695 F.2d 96 (5th Cir. 1983). In that case, the Fifth Circuit held that "arranged sales in which the mark was not allowed to play its basic role of identifying source were not 'use'" consistent with the Lanham Act.[3] 695 F.2d at 101. The Fifth Circuit also identified the proper inquiry for analyzing intent for

---

[3] Upon remand, the district court concluded that the trademark owner's efforts amounted to an intent to resume commercial use of the mark "HUMBLE." *Exxon Corp. v. Humble Expl. Co.*, 592 F. Supp. 1226, 1230 (N.D. Tex. 1984). The University's circumstances are distinguishable from Exxon's circumstances because Exxon had a plan to use the "HUMBLE" mark in tandem with the "EXXON" mark on shipping drums sent to "purchasers throughout the United States" on the order of "a quarter of a million drums per

trademark abandonment purposes as "whether [the trademark owner] intended to resume meaningful commercial use of the mark, not whether it intended to abandon the mark." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1550 (11th Cir. 1986) (citing *Humble*); *see also Intrawest Fin. Corp. v. Western Nat. Bank of Denver*, 610 F. Supp. 950, 959 (D. Colo. 1985) (finding that after formal name change and rebranding, attempts to revive "use" to prevent others from using a mark were insufficient, as "the mark must serve as an identifier").

The University's underground licensing of the Chief Logo does not indicate sincere, genuine attempts to use the Chief Logo as a source-identifier. Contrary to the purpose and spirit of trademark law, the University invests in concealing itself as the source of the Chief Logo goods by: prohibiting the sale of such goods on its official online stores such as *<Fightingillini.com>* (SMF ¶ 38); prohibiting the sale of such goods by local companies (*id.* ¶ 30); and policing and eliminating the physical presence of such goods in brick and mortar stores (*id.* ¶¶ 31–34). The result of this intentional obfuscation is the University's abject failure to use the Chief Logo as a source-identifier. The University's trademark maintenance program is thus inconsistent with the purposes of the Lanham Act and does not represent *bona fide* use.

**D.    The University's Trademark Maintenance Program Generates Only *De Minimis* Licensing Revenue and the University Has Made No Efforts to Expand Sales.**

The University may point to its actual sales and licensing of apparel displaying the Chief Logo to defend its trademark maintenance program, but as one court put it, "sales are not the *sine qua non* of trademark use." *Perry v. H. J. Heinz Co. Brands, LLC*, 994 F.3d 466, 476 (5th Cir. 2021) (internal quotation omitted). And merely nominal shipments of goods and trickling, *de minimis* revenue do not represent *bona fide* use. *Procter & Gamble*, 485 F. Supp. at 1206.

---

year" and containing "[r]oughly 140 different products." *Id.* at 1228. The University's purported use differs in terms of its nature—*not* being source-identifying—and its small scale.

For example, in *Perry*, in analyzing whether a trademark owner had abandoned use of the mark "METCHUP," the court looked at *de minimis* sales combined with "next to no effort to grow the sales of Metchup." *Perry*, 994 F.3d at 476. Notably, the *Perry* court remarked that "the Seventh Circuit has cabined cases like *Le Galion* and *Humble*[—which found that *de minimis* use could undercut trademark rights—]to situations involving a trademark maintenance program or defensive trademark use," and observed that there is no "threshold use or sales requirement"; instead, what matters is "a sincere, good-faith business effort," as opposed to an intent merely to reserve rights. *Id*. In *Perry*, the court concluded that there was an absence of "definitive proof of a trademark maintenance program" and remanded to examine whether use was *bona fide*.

Here, there is no need for further fact finding regarding the University's initiation of a trademark maintenance program. *See supra* Part III.C. And while the University does have some infinitesimal licensing revenue generated from scant sales of apparel displaying the Chief Logo, it is *de minimis*, token use amounting to .6% or less of its overall licensing revenue. (SMF ¶ 43.) In one communication to a news outlet, the University reported that from 2009–2012, gross royalties generated on Chief Logo-emblazoned apparel totaled between $1,670–$6,039, which cannot be described as anything but token numbers compared to the $1.9 million to $2.1 million generated by royalties for its traditional licensing program. (*Id*. ¶¶ 44–45).

Moreover, the University has made no effort to expand sales of products bearing the Chief Logo. To the contrary, the University severely limits the number and types of licensees permitted to display the Chief Logo and prohibits sales in brick and mortar stores. (*Id*. ¶¶ 23–25, 30, 47.b.) Additionally, the University enforces an online-only sales policy by rigorously policing any physical presence of the goods bearing the Chief Logo, ensuring its own complete disassociation with the image. (*Id*. ¶¶ 31–34.) Even the limited licensing the University does engage in

14

demonstrates a lack of *bona fide* intent to commercialize and "use" the Chief Logo. *See, e.g.*, (*Id.* ¶¶ 35–36) (discussing rebranding efforts with licensee Nike, which notes "[a]s we continue to move away from Chief Illini, I wanted to make sure all the ts were crossed and Is were dotted"). For example, the University specifically directed that "Chief related" products be left off a holiday-themed promotion with one of its licensees, (*id.* ¶ 40), and directed another licensee not to promote a page with "Chief references and gear" on a University site. (*Id.* ¶ 39.)

More importantly, the University's intent underlying the trademark maintenance program is clear—the University hopes to reserve its rights to the exclusion of others, but it has no intention of advertising or marketing itself as the source of goods associated with the Chief Logo. (*See id.* ¶¶ 6, 21, 37.) In fact, the record is replete with commitments to end any public association with the Chief Logo. (*See, e.g.*, *id.* ¶¶ 5–9.) But the University cannot distance itself from the sales of the Chief Logo apparel publicly, while reserving its rights in the mark through these *de minimis* sales and orchestrated efforts to disconnect source-identity from the Chief Logo goods. Its "use" should be deemed insufficient under the Lanham Act and its rights abandoned.

## IV. CONCLUSION

The Court should reject the University's attempt to use the Lanham Act to sit on rights to a logo it has publicly rebuked and discontinued. The evidence demonstrates non-use of the Chief Logo —and the University's intent not to resume use—since 2007, when the University publicly and formally disassociated itself from Native American imagery. The University's subsequent efforts at a covert trademark maintenance scheme are unavailing because they fail to rise to the level of *bona fide* use. Accordingly, the Chief Logo must be deemed abandoned, and the University's claims based on its supposed trademark rights in that design dismissed. Vintage Brand's motion should be granted.

DATED this 8th day of November, 2022.

/s/ Theresa H. Wang
_____

Theresa H. Wang (*pro hac vice*)
Joshua D. Harms (*pro hac vice*)
Leslie C. Vander Griend (*pro hac vice*)
STOKES LAWRENCE, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, Washington 98101
Tel: (206) 626-6000
Email: theresa.wang@stokeslaw.com
Email: joshua.harms@stokeslaw.com
Email: leslie.vandergriend@stokeslaw.com

Richard D. Boonstra (No. 6185045)
Todd Postma (No. 6339529)
HOOGENDOORN & TALBOT LLP
122 South Michigan Avenue, Suite 1220
Chicago, Illinois 60603
Tel: (312) 786-2250
Email: rboonstra@htlaw.com
Email: tpostma@htlaw.com

*Attorneys for Defendant Vintage Brand, LLC*