> *or application which is of interest to the sponsor, the University may accept research agreements with terms which entitle the sponsor to specific commercial rights within the defined field of interest.... The University may also determine, on a case-by-case basis, that it is in the university's interest to assign ownership of resulting intellectual property to the sponsor as an exception to this policy when circumstances warrant such action, in accordance with guidelines established by the University Intellectual Property Committee.*

In place of case-by-case exceptions, the variance requested is a blanket exception to allow TSC contractual agreements to include ownership by the client company of any new intellectual property created out of the agreement. Any previously developed intellectual property that the University brings to the project will stay with the University. The University will retain publishing rights unless pre-determined confidentiality restrictions apply.

The second request is for a variance to the University of Illinois *Statutes* regarding faculty and staff compensation. Article IX. Academic and Administrative Units, Section 5c. Services Rendered the University, states:

> *Full-time employees shall not receive compensation for services with the University in excess of a normal schedule except for a reasonable amount of instruction in continuing education and public service programs or for the grading of special examinations (outside regular course work) stipulated by the University, all to be done at a time that does not conflict with other university duties. Exceptions may be made to this rule in special cases which are approved by the dean of the college of which the employee is a member provided that if such additional payments exceed a nominal amount the advance approval of the chancellor shall be secured. These exceptions shall be held to a minimum.*

The financial structure of the TSCs is based on a fee-for-service model wherein the TSC charges an hourly rate for services of its students and faculty. Faculty participation in the TSCs will be treated as paid consulting and will be subject to the applicable annual reporting requirements and restrictions that limit consulting to one day per week. The variance requested is for a blanket extension of the exception categories to permit any faculty or staff member assigned to a TSC project to be eligible for such additional compensation as warranted by the consulting agreement. Approval by the dean will be required.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure,* and Board of Trustees policies and directives.

The plan has received the overwhelming endorsement of the college's Executive Committee and the college faculty.

The president of the University concurs.

On motion of Dr. Schmidt, this recommendation was approved.

## Establish Center for Botanical Dietary Supplements Research, College of Pharmacy, Chicago

(17) The chancellor at Chicago with the advice of the Chicago Senate, the Graduate College, and the College of Pharmacy recommends the establishment of the Center for Botanical Dietary Supplements Research. The Center received temporary approval in 1999 from the Illinois Board of Higher Education and now seeks permanent approval.

In 1999 Congress recognized a need to provide support for researchers in the field of natural products and authorized the National Institutes of Health (NIH) to establish botanical centers to perform extensive research on the biological effects of botanicals and to perform preliminary clinical studies related to human health. The Chicago campus' botanical center was established as a training center for new scientists in the field. The Center is unique in the State of Illinois.

Exhibit 4 - Page 41 of 85

With continued support of the NIH, the Botanical Dietary Supplements Research Center conducts basic and applied research which begins with the verification of botanicals and extends to their chemical and biological standardization and final formulation for use in clinical studies. Because of the extensive use of botanical dietary supplements by the American public, the ultimate goal of research in the Center is to select promising botanicals and thoroughly research them from field to use in humans as dietary supplements. It also educates the next generation of scientists and health care providers in the field of natural products as they apply to human health. The Center is a facilitator of translational research–a major goal of the campus' strategic plan.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure,* and Board of Trustees policies and directives.

The University Senates Conference has indicated that no further senate jurisdiction is involved.

The president of the University concurs. This action is subject to further review and approval by the Illinois Board of Higher Education.

On motion of Dr. Schmidt, this recommendation was approved.

### Establish School of Earth, Society and Environment, College of Liberal Arts and Sciences, Urbana

(18) The chancellor at Urbana with the advice of the Urbana-Champaign Senate recommends for approval a proposal from the College of Liberal Arts and Sciences to establish the School of Earth, Society and Environment.

The proposed School, which will include the Departments of Atmospheric Sciences, Geography, and Geology, has the potential to greatly improve the University's stature and performance in research and teaching related to the earth sciences and their interactions with society and the environment. The School will serve as an intellectual focus for research and education in environmental studies and policy within the College of Liberal Arts and Sciences; help foster productive collaborations concerning these topics with units in other colleges; and present common interests to the higher administration and campus.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure,* and the Board of Trustees policies and directives.

The University Senates Conference has indicated that no further senate jurisdiction is involved.

The president of the University concurs. This action is subject to further review and approval by the Illinois Board of Higher Education.

On motion of Dr. Schmidt, this recommendation was approved.

### Merge the Institute for Legislative Studies with the Institute for Legal and Policy Studies, Springfield

(19) The chancellor at Springfield with the advice of the Springfield Senate recommends approval of the merger of the Institute for Legislative Studies with the Institute for Legal and Policy Studies and naming the new unit the Institute for Legal, Legislative and Policy Studies.

The institutes are both units within the Center for State Policy and Leadership. By merging the two units under a single director and a unified administrative structure, the goals and objectives of the Center for State Policy and Leadership can be more effectively and efficiently achieved. The savings in administrative costs can be used to create additional joint faculty appointments between University of Illinois at Springfield academic units and the Center.

The University Senates Conference has indicated that no further senate jurisdiction is involved.

The president of the University concurs. This action is subject to further review and approval by the Illinois Board of Higher Education.

Exhibit 4 - Page 42 of 85

On motion of Dr. Schmidt, this recommendation was approved.

### Eliminate the Bachelor of Arts in Liberal Arts and Sciences, Major in Art History, College of Liberal Arts and Sciences, Chicago

(20)  The chancellor at Chicago with the advice of the Chicago Senate, the College of Liberal Arts and Sciences, and the College of Architecture and the Arts, recommends the elimination of the Bachelor of Arts in Liberal Arts and Sciences, Major in Art History, College of Liberal Arts and Sciences (LAS).

Currently, the Chicago campus offers both a Bachelor of Arts in Art History through the College of Architecture and the Arts and a Bachelor of Arts in Liberal Arts and Sciences, Major in Art History, through the College of LAS.  The presence of both programs has been confusing to student applicants, particularly because admissions criteria to the program in the College of Architecture and the Arts are more rigorous than those in LAS, resulting in a two-tiered system.  General education requirements for the two programs require students to have advisors in both colleges, contributing further to the confusion of students.  The offering of a single program will allow faculty to provide closer academic guidance than is currently the case and ensure a clearer understanding of the curriculum for students and applicants.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure*, and Board of Trustees policies and directives.

The University Senates Conference has indicated that no further senate jurisdiction is involved.

The president of the University concurs.  This action is subject to further review and approval by the Illinois Board of Higher Education.

On motion of Dr. Schmidt, this recommendation was approved.

### Eliminate the Doctor of Arts in Biological Sciences, College of Liberal Arts and Sciences, Chicago

(21)  The chancellor at Chicago with the advice of the Chicago Senate, the College of Liberal Arts and Sciences, and the Graduate College recommends the elimination of the Doctor of Arts in Biological Sciences, College of Liberal Arts and Sciences.

The Doctor of Arts degree was awarded to only five students during the period 1982 to 1991.  The last student to enroll in the program in 1994 did not complete the degree.  No additional students have been admitted to the program since that time and a Ph.D. in Biological Sciences has been approved as the primary doctoral level program in the Department of Biological Sciences.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure*, and Board of Trustees policies and directives.

The University Senates Conference has indicated that no further senate jurisdiction is involved.

The president of the University concurs.  This action is subject to further review and approval by the Illinois Board of Higher Education.

On motion of Dr. Schmidt, this recommendation was approved.

### Student Fees for Chicago, Springfield, and Urbana, Fiscal Year 2008

(22)  The chancellors at each campus have recommended student fee levels for Fiscal Year 2008 to support auxiliary operations, student programs and activities, and student health services.  The fees recommended are required to meet continuing components (salaries and wages, utilities, goods and services), student programs, and operating costs including debt service, and repair and replacement programs of facilities that comprise the Auxiliary Facilities Systems.

Exhibit 4 - Page 43 of 85

328                          BOARD OF TRUSTEES                        [March 13

**Chicago campus**

At Chicago, the $44 (5.1 percent) increase in the Service, General, and Health Fees for the Chicago Campus is based on projected general costs, utilities, and debt service requirements. The General Fee increase is driven largely by projected utilities costs and funds that will be provided to the Office of Student Financial Aid to cover the incremental costs associated with the fee portion of the Chicago campus Grant for the neediest students. The Transportation Fee rate (currently at $95) will be established after the Chicago Transit Authority (CTA) provides the FY 2008 rate in March 2007 and after a student referendum is held in April 2007.

**Springfield campus**

The $110 increase (26.2 percent) in the Service, General, and Health Fees for the Springfield campus is to provide for continued support of student programs, organizations, career services, health services, and debt service increases.

**Urbana-Champaign campus**

The $58 increase (8.5 percent) in the Service, General, and Health Fees for the Urbana campus is to provide for projected general cost, utilities, and debt service increases. The fees also incorporate the new student fee payer bases.

The following table presents the current and proposed fee levels for the programs described above.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure*, and Board of Trustees policies and directives.

The vice president/chief financial officer and the vice president for planning and administration concur in the fee levels proposed.

The president of the University recommends approval.

University of Illinois
Summary of Fiscal Year 2008 Semester Student Fees

| Chicago | FY 2007 | Proposed FY 2008 | Percent Increase |
|---|---|---|---|
| Student Fees | | | |
| Service Fee | $288 | $304 | |
| General Fee | 371 | 394 | |
| Health Fee | 99 | 104 | |
| Campus Transportation * | 95 | 95 | |
| Student-to-Student Assistance | 3 | 3 | |
| *Total Per Semester* | $856 | $900 | 5.1% |

*The Transportation Fee rate (currently at $95) will be established after the Chicago Transit Authority (CTA) provides the FY 2008 rate in March 2007 and after a student referendum is held in April 2007.

The Health Insurance Fee rate (currently at $378) will be established after consultations between the vice chancellor for student affairs, Campus Care, University Risk Management, and students are completed in February 2007.

| Springfield | FY 2007 | Proposed FY 2008 | Percent Increase |
|---|---|---|---|
| Student Fees | | | |
| Service Fee | $237 | $250 | |
| General Fee * | 154 | 249 | |
| Health Fee | 25 | 27 | |
| Student-to-Student Assistance | 4 | 4 | |
| *Total Per Semester* | $420 | $530 | 26.2% |

*A spring 2003 Student Referendum approved a stepped-up fee structure for the UIS Recreation Center. The fee will increase from $90 to $185 per semester in FY 2008.

Exhibit 4 - Page 44 of 85

| Urbana-Champaign | FY 2007 | Proposed FY 2008 | Percent Increase |
|---|---|---|---|
| Student Fees | | | |
| Service Fee | $193 | $221 | |
| General Fee | 228 | 237 | |
| Health Fee | 196 | 207 | |
| Campus Transit/Safe Rides | 38 | 38 | |
| SEAL/SORF/Others* | 24 | 24 | |
| Krannert | 5 | 15 | |
| Total Per Semester | $684 | $742 | 8.5% |

*SEAL/SORF, $20; Energy Technologies Fee, $2; Cultural Programming Fee, $2

On motion of Dr. Schmidt, these recommendations were approved.

### Student Health Insurance Fees for Chicago, Springfield, and Urbana Campuses, Fiscal Year 2008

(23)  The chancellors at Chicago, Springfield, and Urbana recommend approval of student health insurance fees for Fiscal Year 2008.  The student health insurance fee, combined with the student health service fee, fund health care programs tailored to meet the needs of the students at the campuses.  The campuses consult with student advisory groups on health program coverage and the resulting fee.  Students may choose not to participate in the student health insurance program by providing evidence of comparable insurance coverage from other sources.  Attached is a summary of the student health program coverage.  (The summary is filed with the secretary of the Board for record.)

Beginning in 2004 the Chicago campus proposed the adoption of a self-funded plan to increase student benefits and contain costs.  All care, with the exception of emergencies, is provided at the UIC Medical Center.  All students receive the same benefit package and have the added feature of services for well child care for covered dependents under age six.  Higher than anticipated costs for prescription drugs, medical inflation, as well as increased costs for ambulance services, necessitates a 6 percent increase for FY 2008.

In 2005 the Urbana campus issued a RFP for student health insurance selecting Student Resources, through the insurance carrier Mega Life as the plan provider.  The Mega Life program at Urbana provides basic coverage for undergraduate students and expanded benefits for graduate students.  Coverage enhancements have been made to both plans since 2005.  Based on better than expected claims experience, which offsets inflationary costs, there will be no price increase necessary for either the graduate or undergraduate plans for FY 2008.  Renewal options exist through 2015.

For FY 2008 Springfield campus leaders determined their changing mix of students required not only a competitively priced program, but enhanced coverages in order to better align the Springfield campus with the Urbana and Chicago student health insurance plans.  Therefore, the Springfield campus recently issued a RFP for the purchase of student health insurance, which will be brought forward at the May 2007 Board meeting.  While negotiations are continuing, indications are that FY 2008 pricing will not exceed the current FY 2007 pricing*.  However, Board of Trustees approval will be solicited in May should the fee be greater than shown below.

The recommended student health insurance fees per semester are as follows:

Exhibit 4 - Page 45 of 85

| Location | Proposed Premium, Fall 2007 | Percent Increase |
|---|---|---|
|  |  |  |
| Chicago | All students–$401 | +6.0 |
|  |  |  |
| Springfield | All students–$291* | 0 |
|  |  |  |
| Urbana | Undergraduate–$180 | 0 |
|  | Graduate–$256 | 0 |

The rates displayed are for the typical undergraduate and graduate student. Rates may vary for summer session, family dependent coverage, etc. Students needing coverage for their spouse and dependents voluntarily pay a separate charge.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure,* and Board of Trustees policies and directives.

The vice president/chief financial officer and the vice president for planning and administration concur in these recommendations.

The president of the University recommends approval.

On motion of Dr. Schmidt, these recommendations were approved.

### Rate Changes for University-Operated Housing Facilities, Chicago, Springfield, and Urbana, Fiscal Year 2008

(24) The chancellors at each campus have recommended rate changes for University-operated housing for Fiscal Year 2008. The increases are required to meet operational costs (salaries and wages, utilities, general price increases, including food), to provide for student program enhancements, and to provide for debt service and repair and replacement reserve requirements.

Chicago

**Residence Halls** (room and board, academic year)

| Unit | 2006-07 | Proposed 2007-08 | Dollar Increase | Percent Increase |
|---|---|---|---|---|
| **Student Residence Hall** |  |  |  |  |
| Single | $7,840 | $8,232 | $392 | 5.0 |
| Double | 7,192 | 7,552 | 360 | 5.0 |
|  |  |  |  |  |
| **Polk Residence Hall** |  |  |  |  |
| Suite Double | 7,548 | 7,926 | 378 | 5.0 |
|  |  |  |  |  |
| Student Residence and Commons* |  |  |  |  |
| Double | 7,446 | 7,818 | 372 | 5.0 |

* The Standard Rate is $7,818. Rates for the Student Residence and Commons will range from $7,620 to $8,940 depending on room configuration. These rates include a board charge of $2,176.

Exhibit 4 - Page 46 of 85

**Apartments** (room only, academic year)

| Single Student Residence Hall | 2006-07 | Proposed 2007-08 | Dollar Increase | Percent Increase |
|---|---|---|---|---|
| Two-person apt. (per person) | $6,462 | $6,818 | $356 | 5.5 |
| Three-person apt. (per person) | 6,334 | 6,682 | 348 | 5.5 |
| Four-person apt. (per person) | 6,408 | 6,760 | 352 | 5.5 |
| 2/3 person suite (per person) | 5,524 | 5,828 | 304 | 5.5 |

| Thomas Beckham and Marie Robinson Halls | 2006-07 | Proposed 2007-08 | Dollar Increase | Percent Increase |
|---|---|---|---|---|
| Two-person apt. (per person) | $7,018 | $7,440 | $422 | 6.0 |
| Four-person apt. (per person) | 6,892 | 7,306 | 414 | 6.0 |

**Suites** (room and board, academic year)

| South Campus Student Suites | 2006-07 | Proposed 2007-08 | Dollar Increase | Percent Increase |
|---|---|---|---|---|
| James Stukel Tower Suite Double | Opening | $8,400 | NA | NA |
| James Stukel Tower Suite Single | Aug. 07 | 8,940 | NA | NA |

Springfield

**Apartments** (room only, academic year)

| Family Apartments | 2006-07 | Proposed 2007-08 | Dollar Increase | Percent Increase |
|---|---|---|---|---|
| Two bdrm/Furnished | $6,760 | $7,900 | $1,140 | 16.9 |
| Two bdrm/Furnished/Renovated | 6,880 | 8,200 | 1,320 | 19.2 |
| Two bdrm/Unfurnished | 6,115 | 6,700 | 585 | 9.6 |
| One bdrm/Furnished | 5,285 | 5,800 | 515 | 9.7 |
| One bdrm/Unfurnished | 4,800 | 5,100 | 300 | 6.3 |

| Single Student Apartments | | | | |
|---|---|---|---|---|
| Four bdrm/Private/Townhouse | $3,920 | $4,400 | $480 | 12.2 |
| 2-3-5 bdrm/Private/Renovated | 3,530 | 4,000 | 470 | 13.3 |
| 2-3-5 bdrm/Shared/Renovated | 2,280 | 2,630 | 350 | 15.4 |
| Four bdrm/Private/Flat | 3,400 | 3,800 | 400 | 11.8 |
| One bdrm/Private/Flat | 5,285 | 5,800 | 515 | 9.7 |
| Two bdrm/Shared/Flat (4 people) | 1,975 | 2,200 | 225 | 11.4 |

**Residence Halls** (room only, academic year)

| Lincoln Residence Hall | $4,995 | $5,746 | $751 | 15.0 |
|---|---|---|---|---|

*Notes:*

Rates for Furnished Family Apartments may be eliminated during FY07, as the Springfield campus attempts to transition to totally unfurnished units for nearly all family housing apartments.

The rate for Capital Scholars in Lincoln Residence Hall (LRH) includes proposed increases for room only. The Board rate the student is required to select ($1000 or $1350 per semester) will increase package accordingly, to $7,746 or $8,446 annually.

The apartment rate is for a selected bedroom style only. No meal plan is required of apartment residents, but one is available for $350 per semester.

All rates are fully inclusive of all electricity, cable TV, and technology/telecommunication costs passed along to residents.

Exhibit 4 - Page 47 of 85

332            BOARD OF TRUSTEES            [March 13

Urbana-Champaign

**Undergraduate Housing** (room and board, academic year)

| Unit | 2006-07 | Proposed 2007-08 | Dollar Increase | Percent Increase |
|------|---------|------------------|-----------------|------------------|
| Single | $8,248 | $8,760 | $512 | 6.2 |
| Double | 7,216 | 7,666 | 450 | 6.2 |
| Triple | 6,812 | 7,234 | 422 | 6.2 |

*Notes:*

The above rates include the 14-meals-per-week classic (traditional) board plan. All undergraduate contracts must include one of six meal plans: 14 meals classic, 20 meals classic, 12 meals classic + 1,500 café credits, 10 meals classic + 4,500 café credits, 10 meals classic + 6,000 café credits, or all café credits (11,500).

Rates in halls with air conditioning will be $200 more than the above rates.

Rates in halls with learning communities will be up to $300 higher than the above rates.

The rates quoted do not include the $16 Student Involvement dues.

**Graduate Housing** (room only, academic year)

| Unit | 2006-07 | Proposed 2007-08 | Dollar Increase | Percent Increase |
|------|---------|------------------|-----------------|------------------|
| Sherman Hall (air conditioned) | | | | |
| Single | $4,024 | $4,274 | $250 | 6.2 |
| Double | 3,850 | 4,090 | 240 | 6.2 |
| | | | | |
| Daniels Hall (air conditioned) | | | | |
| Single/private bath | $5,290 | $5,620 | $330 | 6.2 |
| Single/shared bath | 5,076 | 5,392 | 316 | 6.2 |
| Double | 4,630 | 4,918 | 288 | 6.2 |

| Unit | 2006-07 | Proposed 2007-08 | Dollar Increase | Percent Increase |
|------|---------|------------------|-----------------|------------------|
| Board Contract (optional) | | | | |
| 14 meals classic | $4,020 | $4,270 | $250 | 6.2 |
| 20 meals classic | 4,504 | 4,784 | 280 | 6.2 |
| 12 classic + 1,500 credits | 4,020 | 4,270 | 250 | 6.2 |
| 10 classic + 4,500 credits | 4,504 | 4,784 | 280 | 6.2 |
| 10 classic + 6,000 credits | 4,956 | 5,264 | 308 | 6.2 |
| All café credits (11,500) | 4,768 | 5,064 | 296 | 6.2 |

*Note:* Rates quoted do not include the $8 Student Involvement dues.

| Unit | 2006-07 | Proposed 2007-08 | Dollar Increase | Percent Increase |
|------|---------|------------------|-----------------|------------------|
| **Goodwin-Green** (monthly rates - includes heat) | | | | |
| Sleeping rooms | $497 | $527 | $30 | 6.0 |
| Efficiency | 582 | 617 | 35 | 6.0 |
| Efficiency with dining | 601 | 637 | 36 | 6.0 |
| One bedroom | 690 | 732 | 42 | 6.1 |
| One bedroom with dining | 708 | 751 | 43 | 6.1 |

Exhibit 4 - Page 48 of 85

**Orchard Downs** (monthly rates)

|  | 2006-07 | Proposed 2007-08 | Dollar Increase | Percent Increase |
|---|---|---|---|---|
| One bedroom | $576 | $599 | $23 | 4.0 |
| One bedroom- unfurnished | 479 | 502 | 23 | 4.8 |
| Two bedrooms | 645 | 676 | 31 | 4.8 |
| Two bedrooms- unfurnished at Orchard South | 515 | 540 | 25 | 4.9 |
| Two bedrooms- unfurnished | 605 | 634 | 29 | 4.8 |

*Note:* Rates in Orchard Downs include a special assessment for an intergovernmental agreement with the City of Urbana.

**Beckwith Living Center** (room & board, 19 meal plan, academic year)

|  | 2006-07 | Proposed 2007-08 | Dollar Increase | Percent Increase |
|---|---|---|---|---|
| Single room[1] | $25,040 | $25,660 | $620 | 2.5 |
| Single room[2] | 12,410 | 13,030 | 620 | 5.0 |

[1]Room and Board with full assistance with Activities of Daily Living (ADL – showering, dressing, personal care, etc.)

[2]Room and Board without full assistance with Activities of Daily Living

The fees include a $1 increase for pharmacy supplies; $0.63 increase for Career Center graduate assistant salaries; $0.19 for Illini Union VIP Office; a $3 increase for athletic facilities and $9.18 (Phase I of II) for converting the Dean of Students from State funds to student fees.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure*, and Board of Trustees policies and directives.

The vice president/chief financial officer and the vice president for planning and administration concur in these recommendations.

The president of the University recommends approval.

On motion of Dr. Schmidt, these recommendations were approved.

### Graduate Application Fee Increases, Springfield and Urbana

(25)  The chancellors at Springfield and Urbana recommend increasing the graduate application fees from $50 to $60 for domestic applications and $60 to $75 for international applications.  Incremental revenue from these increases will be used to offset the increasing costs of recruiting efforts and application processing.  In recent years, the campuses have seen increases in graduate applications and these rate changes are not expected to have an impact on graduate enrollments.  The increases will not impact applicants who cannot meet the cost due to financial hardship, since the application fee may be waived for such persons.  This increase takes effect upon approval by the Board.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure*, and Board of Trustees policies and directives.

The chancellors, the vice president/chief financial officer, and the vice president for planning and administration concur.

The president of the University recommends approval.

On motion of Dr. Schmidt, this recommendation was approved.

### Application Fee for the Doctor of Dental Surgery (D.D.S.) Program, College of Dentistry, Chicago

(26)  The chancellor at Chicago recommends increasing the application fee for the Doctor of Dental Surgery (D.D.S.) degree program, College of Dentistry, from $40 to $65 effective June 1, 2007.

The fee has remained constant at $40 for nine years.  In 2005, the college implemented a new screening and interviewing process which requires greater faculty and staff participation.  The increase in fee will offset the increased administrative costs.  The $65

Exhibit 4 - Page 49 of 85

334  BOARD OF TRUSTEES  [March 13

fee is competitive with other dental school application fees.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure,* and Board of Trustees policies and directives.

The president of the University concurs.

On motion of Dr. Schmidt, this recommendation was approved.

**Tuition and Fee Increases,
Cost Recovery, Off-Campus, On-Line, and Aviation Programs,
Fiscal Year 2008**

I

(27)  The Urbana campus provides several academic programs on a "full cost recovery" basis (i.e., all costs are met through a combination of tuition and fee charges).  Tuition and fee requirements for each of these programs are reviewed and adjusted annually to ensure that adequate revenues are available to operate each program.

For Fiscal Year 2008, the following actions are proposed for cost recovery programs:

Proposed Annual Tuition and Fees
FY 2008

**Executive MBA Program***

|  | FY 2007 | Proposed FY 2008 | FY 2008 Increase |
|---|---|---|---|
| Tuition | $74,000 | $72,000 | |
| Program Fees | | 2,000 | |
| *Total* | $74,000 | $74,000 | $0 |

*For Five-Term Program

**Master of Science in Finance**

|  | FY 2007 | Proposed FY 2008 | FY 2008 Increase |
|---|---|---|---|
| Tuition | $30,000 | $30,000 | |
| Program Fees | 7,500 | 7,500 | |
| *Total* | $37,500 | $37,500 | $0 |

**Master of Science in Business Administration**

|  | FY 2007 | Proposed FY 2008 | FY 2008 Increase |
|---|---|---|---|
| Tuition | $25,300 | $26,000 | |
| Program Fees | 7,632 | 7,500 | |
| *Total* | $32,932 | $33,500 | $568 |

**Master of Science in Policy Economics**

|  | FY 2007 | Proposed FY 2008 | FY 2008 Increase |
|---|---|---|---|
| Tuition | $18,360 | $19,120 | |
| Program Fees | 4,760 | 5,600 | |
| *Total* | $23,120 | $24,720 | $1,600 |

Exhibit 4 - Page 50 of 85

### Master of Science in Accountancy

|  | FY 2007 | Proposed FY 2008 | FY 2008 Increase |
|---|---|---|---|
| Tuition | $27,000 | $30,000 |  |
| Program Fees | 5,500 | 5,500 |  |
| *Total* | $32,500 | $35,500 | $3,000 |

### Master of Science in Accountancy-Tax (Chicago)
### (UIUC in Chicago)

|  | FY 2007 | Proposed FY 2008 | FY 2008 Increase |
|---|---|---|---|
| Tuition | $35,000 | $35,000 |  |
| *Total* | $35,000 | $35,000 | $0 |

The **Executive MBA Program** is a five-semester program that includes one summer. The tuition increase recommended for FY 2008 will affect only entering students in the entering class of 2008. Total tuition revenue available for FY 2008 will be sufficient to cover all projected academic program costs.

The **Policy Economics, Finance, Business Administration, and Accountancy** programs are specially designed, intensive programs of study leading to a Master of Science degree in a business related discipline. They are intended for promising international administrators in government and private institutions who need additional training in areas of economic analysis and quantitative techniques. Additional funds are required in FY 2008 to provide for normal cost increases for these programs.

#### II

The unique costs associated with instructional requirements in the **Institute of Aviation** are addressed by specific charges for individual courses. Charges differ based upon the type of equipment required, the frequency of its use, the instructional mode (classroom, flight simulator, aircraft, etc.) and so on. Annual reviews of aircraft and simulator operating expenses and other equipment training needs are conducted along with projected wage requirements for the next year. Corresponding adjustments are then made in course charges. For FY 2008, current rates have been adjusted for materials, labor, insurance, and flight time.

Aviation course charges proposed for FY 2008 are specified below:

| Course | FY 2007 | Proposed FY 2008 |
|---|---|---|
| Avi 090 | $2,909 | $3,018 |
| Avi 101 | 3,423 | 3,548 |
| Avi 120 | 4,422 | 4,582 |
| Avi 121 | 2,129 | 2,207 |
| Avi 130 | 3,980 | 4,125 |
| Avi 140 | 4,212 | 4,365 |
| Avi 200 | 5,719 | 5,926 |
| Avi 210 | 5,678 | 5,884 |
| Avi 320 | 3,598 | 3,744 |
| Avi 322 | 1,945 | 2,016 |
| Avi 324 | 3,043 | 3,093 |
| Avi 380 | 4,588 | 4,763 |
| Avi 381 | 1,107 | 1,148 |
| Avi 391 | 3,887 | 4,032 |
| Avi 392 | 6,823 | 7,083 |
| Avi 393 | 901 | 934 |

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure,* and Board of Trustees policies and directives.

Exhibit 4 - Page 51 of 85

These changes have been reviewed and are recommended for approval by the chancellor at Urbana, the vice president/chief financial officer, and the vice president for planning and administration.

The president of the University concurs.

On motion of Dr. Schmidt, these recommendations were approved.

## Library—Information Technology Fee, Fiscal Year 2008, Urbana

(28)  The University of Illinois at Urbana-Champaign maintains one of the world's largest and best academic libraries.  The University Library holds a collection of more than 23 million items, including over 9 million volumes, more than 90,000 serial titles, and more than 6 million manuscripts, as well as maps, slides, audio tapes, microforms, videotapes, laser discs, and other non-print material.  The Urbana campus has been a leader in leveraging the University's assets for all of Illinois' citizens.  Records of the collections form the bulk of the Library's Online Catalog.  This catalog is part of the ILLINET Online system, which links the Library to other academic libraries in Illinois.  Users at these academic libraries may borrow books directly from participating Library's collections.  Nationally and internationally, the Library's collections are accessible through the Online Computer Library Center (OCLC) online bibliographic database and the Internet.  In 1992, the Library began to create networked databases, including multimedia databases that are accessible both locally and internationally via the Internet.  By 1994, more than a million users logged on weekly to the Library's online catalog.  The Grainger Engineering Library Information Center, which opened in 1994, is designed to accommodate the latest in both library and user technologies and includes facilities for digital scanning, multimedia database creation, and on-site testing of new library-related software.  Despite these improvements, the Urbana campus' Library has fallen from eighth in 1985 to 17th in the most recent overall national ranking by the Association of Research Libraries.

This fee would be used to aid in the transition towards electronic media and digitalization, increase library hours, improve information technology services, strengthen opportunities for research technology and assistance, create and improve the tools for online learning/research, increase the positions focused on direct support of student learning and services, and enhance access to both electronic and print material collections.  The fee would be phased in over four years.  For all full-time undergraduate and graduate/professional students for which the fee applies, the FY 2008 rate will be $200 per semester for full-time students at Urbana-Champaign.  For students at less than full-time enrollment the fee will be pro-rated according to current tuition range calculations.  Law students will be assessed $250 per semester.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure*, and Board of Trustees policies and directives.

The chancellor, the vice president/chief financial officer, and vice president for planning and administration recommend approval.

The president of the University concurs.

On motion of Dr. Schmidt, this recommendation was approved.

## Designate the Dr. Allan L. and Mary L. Graham Clinical Performance Center in the Medical Sciences Building, Chicago

(29)  The chancellor at Chicago has recommended naming the Clinical Performance Center on the first floor of the Medical Sciences Building, located at 835 South Wolcott Avenue, the Dr. Allan L. and Mary L. Graham Clinical Performance Center, in recognition of their $1.0 million gift to the Center.  Approximately $250,000 will be used to update, remodel, and equip the Center.  The remaining $750,000 will be placed in endowment to support the faculty, staff, and administrative costs of the Center.

The Clinical Performance Center helps educators in the health professions improve clinical performance by using simulated clinical encounters for training, assessment, quality improvement, and research.

Exhibit 4 - Page 52 of 85

Dr. Graham received his Doctor of Veterinary Medicine degree from Urbana in 1954 and his Doctor of Medicine degree from Chicago in 1960. He also did his surgical residency at the University of Illinois Medical Center. Mrs. Graham graduated with a degree in education from the Urbana campus in 1957. Dr. Graham went on to become a successful cardiovascular surgeon in the Fort Worth, Texas, area, where he and Mrs. Graham currently reside.

It has been Dr. Graham's dream to make a significant contribution while he is living. He believes that both veterinary medicine and the College of Medicine have contributed significantly to his lifetime success.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure,* and Board of Trustees policies and directives.

The president of the University concurs.

On motion of Dr. Schmidt, this recommendation was approved.

### Designate Student Housing Name, Springfield

(30) The chancellor at Springfield with the concurrence of the vice chancellor for student and administrative affairs and the Housing Residents Council recommends that the new townhouses being constructed be designated as Trillium Court. This is consistent with campus housing being named after Illinois prairie flowers.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure,* and Board of Trustees policies and directives.

The president of the University concurs with this recommendation.

On motion of Dr. Schmidt, this recommendation was approved.

### Revision of the Medical Service Plan Bylaws, College of Medicine, Chicago

(31) The chancellor at Chicago recommends revisions to the bylaws of the Medical Service Plan ("the MSP"). In July 1967, the Board approved the establishment of the MSP to allow practicing faculty in the College of Medicine to bill, collect, and disburse revenue related to professional charges. The members of the MSP operate under bylaws that provide for the administration and governance of the MSP fund. The MSP bylaws require that any amendments to the bylaws be approved by both the general membership of the MSP as well as the Board of Trustees of the University of Illinois before such amendments will be effective.

In early 2006, the dean of the College of Medicine organized and charged a committee with the task of reviewing and updating the bylaws of the MSP to reflect current policies and practices and set the direction for the future. The revisions proposed by the committee were reviewed and approved by the dean, the MSP Executive Committee, the MSP Board of Directors, and representatives of university counsel. Additionally, the proposed revisions were endorsed by the general membership of the MSP at its annual meeting on October 26, 2006. A copy of the revised bylaws will be filed with the secretary of the Board for record.

The major changes in the MSP bylaws include the following:

1. Formal recognition of MSP Executive Committee. The Executive Committee's authority and responsibility includes, but is not limited to, reviewing MSP departmental budgets and incentive plans; recommending MSP policies to the Board of Directors; recommending corrective actions to the dean; and determining the manner in which the MSP shall bill and collect professional fees, subject to the authority of the MSP Board of Directors and the dean.

Exhibit 4 - Page 53 of 85

2. Confirmation of the ultimate responsibility of the dean of the College of Medicine for management of MSP funds, including department accounts.

3. Requirement that in a case where a cash deficit exists in their MSP account, a department head must first use available funds from other department accounts. If a department head sustains three consecutive months of operating and/or cash deficits, the dean may place the department's MSP account into receivership.

4. Establishment of incentive plans for department heads: under the proposed amendment to the MSP bylaws, the dean shall have increased oversight of incentive compensation to department heads.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure,* and Board of Trustees policies and directives.

The president of the University concurs.

On motion of Dr. Schmidt, this recommendation was approved.

## Amend Articles I, II, III, and V of *The General Rules Concerning University Organization and Procedure*

(32)  *The General Rules Concerning University Organization and Procedure* (*General Rules*) are enacted by the Board of Trustees and supplement the University of Illinois *Statutes.* The *General Rules* address administrative organization; powers, duties, and responsibilities of university officers; and various other administrative matters.

Amendments are recommended to the *General Rules* to include the new titles of vice president/chief financial officer and the vice president for planning and administration as well as other changes to reflect current usage.

Amendments are also recommended to reflect changes in procedures concerning administration of intellectual property.

Revisions and in some cases re-ordering of extant policy are shown on the following pages. Additions to the text are underlined; deletions are lined-out.

### Changes to Titles for Vice Presidents and Other Changes to Reflect Current Usage

Revisions are proposed to Articles I, II, and V to clarify the administrative responsibilities of the vice president/chief financial officer and comptroller, and to add vice president for planning and administration to the listing of vice presidents of the University.

These proposed revisions are reflective of the assignment of responsibilities to the new positions, and the fact that the vice president/chief financial officer also serves as comptroller of the Board of Trustees.

The University Senates Conference has been consulted on the proposed revisions to Articles I and II.

### Changes Regarding the Intellectual Property Policy

Article III and Article V of the *General Rules* concern "intellectual property" and "University property," respectively. Revisions are proposed to these articles to more clearly define the changes in procedures concerning administration of intellectual property and University property.

The following are the key changes in the proposed amendments:

Exhibit 4 - Page 54 of 85

- Article III, Section 1 (Objectives).
Language concerning the purpose of this intellectual property policy has been revised to include enhancing "…the generation of revenue for the University" and … providing "<u>financial and reputational benefits for the creator(s)</u>" and preserving "<u>the University's freedom to conduct research and to use the intellectual property created by that research or pursuant to an institutional initiative.</u>"

- Article III, Section 7(b) (Evaluation and Exploitation Decisions).
Language has been revised to reflect the University's expanded practice in technology commercialization and transfer, specifically articulating that following evaluation of the intellectual property and review of applicable contractual commitments "… the University may develop the property through licensing <u>to an established business or a start-up company</u>, may release it to the sponsor of the research under which it was made (if contractually obligated to do so), may release it to the creator(s) if permitted by law <u>and current University policy</u>, or may take such other actions <s>as are determined</s> <u>considered</u> to be in the public interest."

- Article III, Section 7(f) (Commercialization <s>by Creator(s)</s>.
Language has been revised to clarify that "<u>The license may include clear performance milestones with a provision for recapture of intellectual property if milestones are not achieved.</u>"

- Article III, Section 7(g) (<u>Conflict of Interest and Commitment</u>).
Language has been revised to clarify the University conflict management policy with the addition of the following language, "<u>Commercialization</u> <s>Agreements with</s> <u>activities involving</u> <s>creators</s> <u>University employees</u> will be subject to review <u>of potential conflict of interest and commitment issues</u> and approval of <u>a</u> conflict <s>of interest issues</s> <u>management plan</u> in accordance with applicable University policy."

- Article III, Section 7(<s>j</s><u>k</u>) (Administrative Responsibility).
Language has been revised to indicate that the vice president for technology and economic development has direct authority for University offices <u>and entities involved in technology commercialization and related economic development</u>, and "<u>with the advice of the chancellors, and in</u> consultation with the vice president for academic affairs and <u>the campus</u> vice chancellors for research, the vice president for technology and economic development <s>will</s> <u>shall</u> establish operational guidelines and procedures for the administration of intellectual property.…"

- Article III, Section 8(b) (Revenue Distribution).
Language has been revised to clarify the procedure for revenue distribution when multiple technologies are licensed under a single agreement such that "<u>…the University shall determine and designate the share of the net income to be assigned to each intellectual property.</u>"

- Article III Section 8(b) (1) (Creator's Share).
Language has been revised to clarify the University's role in net income division if creators fail to agree on a decision such that if "<u>…the creators fail to agree mutually on a decision, the University shall determine the division.</u>"

Exhibit 4 - Page 55 of 85

340                          BOARD OF TRUSTEES                    [March 13

- Article V, Section 1(b) (Use of University Premises and Facilities). Language has been revised to clarify the use of facilities use agreements such that a "...facilities use agreement, articulating the terms of use, should reflect the conditions deemed most likely to advance the development and acceptance of the intellectual property."

An initial draft was shared with the chancellors and the University Senates Conference has been consulted and provided comments and suggestions that have been incorporated by the University's Intellectual Property Committee.

The proposed revisions to Articles I, II, III, and V are attached to this item.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure,* and Board of Trustees policies and directives.

The president of the University recommends approval.

## Article I.   University Organization

### Section 1. The University and the Campus

The role of the University of Illinois in the state as a leader in public graduate and professional education rests upon its organic wholeness. It is not a loose federation of universities, nor is it a system of totally independent units. The mission to which the University is committed, and upon which its development thus far has been based, starts with an emphasis on the fundamental responsibility of the University as a whole. The specific contributions that each campus makes to the university's mission are diverse, since they reflect the needs and methodologies appropriate to different settings; but the campuses are alike in the broad nature of their public responsibilities, in their basic educational policies, and in their institutional quality; and they are integrated by a university-wide organization designed to maximize their educational effectiveness and the efficient use of their academic resources.

The campuses of the University of Illinois share common goals, even though each makes a highly differentiated contribution to the university's mission. The campuses are assisted and strengthened by intercampus cooperation and by university-wide services, while carrying out their academic functions with a high degree of delegated authority. The campuses are expected to achieve intercampus cooperation, to avoid unnecessary duplication, to develop missions responsible to their particular orientation and setting, and to build upon and to foster faculty and staff strengths and initiatives. The campuses are encouraged to operate at qualitatively equivalent levels, even though each of them provides different services for varied clientele.

### Section 2. Functions of the University Administration

(a)   The university administration has general responsibility for the entire operation of the University and has the following specific functions to be executed consonant with the policies and actions of the Board of Trustees:

(1) The enunciation of the mission of the University of Illinois; the development of long-range, comprehensive plans for the attainment of that mission; and the development of a plan of evaluation on a regular basis of the success of the University in meeting that mission.

(2) Seek to obtain the resources necessary to permit the support of plans and the development of facilities to meet the mission of the University.

Exhibit 4 - Page 56 of 85

(3) Recommend the allocation of resources, as available, to the campuses and to other units of the University within the requirements and the priorities of the long-range, comprehensive plan for the attainment of the mission of the University.

(4) The development of relationships both within Illinois and elsewhere to ensure that the University plays its appropriate role as a member of the larger educational community.

(5) The coordination of the operation of the various components of the University to ensure that the University functions as an organic university rather than as an aggregation of unrelated campuses and capitalizes upon the advantages of its resources as a system.

(6) The administration of university-wide education and support programs. Examples include the Institute of Government and Public Affairs and the University Press.

(7) The management of tasks which should be accomplished at the university level either for efficiency or to ensure the consistency necessary to permit the University and the Board of Trustees to meet their responsibilities.

(8) The development of public information programs to accomplish understanding of and support for the mission and activities of the University of Illinois.

(b) In addition to the president, the university officers are the vice presidents, including the vice president for academic affairs, the vice president/chief financial officer, the vice president for planning and administration, and the vice president for technology and economic development and corporate relations, the chancellors, the university counsel, the secretary of the University, all of whom report directly to the president, and such additional administrative officers as shall be designated by the president after consultation with the University Senates Conference. Prior to recommending to the Board of Trustees the initial appointment of any university officer except for the president and the chancellors, the president shall seek the advice of the University Senates Conference. On the occasion of the reappointment of any university officer, the University Senates Conference may submit its advice if it so elects.

(c) Functioning under authority delegated by the president, the vice president for academic affairs is the senior academic officer of the University, serving as advisor to the president on matters of educational policy; academic programs, academic personnel actions, capital and operating budget developments, including the establishment of criteria for judgments as to priorities for resource allocation; and on such other matters as the president may designate. The vice president for academic affairs is responsible for the overall coordination of planning and budgeting at the University and also works closely with academic leaders on each campus and with other university officers to assist in the advancement of academic programs and to ensure overall coordination.

(d) Reporting directly to the president, the vice president for technology and economic development is the senior officer of the University serving as an advisor to the president on matters of intellectual property, technology commercialization, and related economic development activities. The vice president for technology and economic development is responsible for coordinating and managing the University's technology commercialization and related economic development initiatives including relevant offices, policies, and programs, and, in so doing, exercises direct line authority over the University's major offices and entities involved in technology commercialization and related economic development.

Exhibit 4 - Page 57 of 85

(e)   The chancellor, under the direction of the president, is the chief executive officer for the campus.  The chancellor has responsibilities and performs duties delegated by the president of the University.  Among those responsibilities and duties are: participation in the university's overall planning, allocation, and evaluation operations; application of university-wide policies; review of academic programs and policies; student affairs; and safety of personnel and property.

(f)   There may be additional administrative officers with university-wide responsibilities and duties as delegated by the president of the University.  The president may make changes in titles and assignment of responsibilities of officers and may recommend to the Board of Trustees additional administrative positions as provided for in Article I, Section 2 of the University *Statutes*.

## Article II.  Business Organization and Policies

### *Section  1. The Comptroller*

As an officer of the Board of Trustees, and in accordance with the Bylaws of the Board, the comptroller shall:

(a)   Approve for the Board all expenditures for which a general or specific appropriation has been made by the Board.

(b)   Assist the finance and investment committee of the Board in matters pertaining to the handling of funds and investments.

(c)   Report to the Board quarterly the financial condition and operation of the University and on other matters at times as the Board may direct.

(d)   Sign contracts to which the University is a party unless otherwise ordered by the Board in specific cases.

(e)   Perform such other functions as may be assigned by the Board of Trustees.

### *Section  2. The Vice President/Chief Financial Officer Administration*

Functioning under authority delegated by the president, the vice president/chief financial officer for administration shall:  be the general business officer of the University and be responsible for the business and finance functions of the campuses of the University, including the business and finance components of all capital project development and implementation.

(b)   Devise and install suitable systems for the administrative (business?) functions of the University.

(c)   Designate the place and manner in which administrative (business?) records shall be maintained.

### *Section  3. Business Policies and Procedures*

(a)   No financial obligation shall be entered into except on authority of the Board and after a general or specific appropriation has been made by the Board allocating funds therefore, as evidenced by its records, and after having been approved by the vice president/chief financial officer vice president for administration.  All allocations of funds made by the Board of Trustees, including those made from funds appropriated to the University by the State of Illinois, shall expire at the end of the fiscal year, June 30, unless otherwise especially ordered.

(b)   For accounting purposes, the fiscal year of the University shall begin with the first day of July of each year and end on the thirtieth day of June next succeeding.

(c)   No department or unit shall receive any monies directly unless authorized by the vice president/chief financial officer for administration to do so.  All monies shall be accounted for and paid over in such manner as the vice president/chief financial officer vice president for administration shall direct.

(d)   The vice president/chief financial officer vice president for administration is authorized to establish and administer petty cash funds where necessary for the prompt and efficient handling of university business, provided that no single fund of more than

Exhibit 4 - Page 58 of 85

$1,000 may be established without specific action of the Board of Trustees. The Board shall designate the banks in which petty cash funds in excess of $1,000 may be deposited.

(e)   The vice president/chief financial officer ~~vice president for administration~~ is permitted to act as treasurer of student and other organizations affiliated with the University, but in so doing shall not thereby create any liability on the part of the Board of Trustees of the University of Illinois. In all cases, the accounts of these organizations shall be kept separate from the university accounts, and the funds of such organizations shall be kept apart from university funds.

(f)   All employees shall be bonded in adequate amount and form, to be determined by the Board, the expense thereof to be paid by the University.

*Section 4. Award and Execution of University Contracts*

(a)   Purchases, construction contracts, and other contracts shall be awarded by the Board of Trustees in accordance with applicable state and federal law and regulations adopted by the Board of Trustees. Contracts involving major changes in or deviations from university policy shall be approved specifically by the Board of Trustees.

(b)   All contracts, other than purchase orders, shall be executed at least in duplicate, and the original thereof shall be filed with the secretary of the Board of Trustees and remain in the custody of the secretary. A report shall periodically be made to the Board of Trustees by the comptroller of all contracts executed on behalf of the University, as the Board may require.

(c)   Contracts relating to appointments to the staff may be executed by the secretary of the Board of Trustees. Agreements providing for the appointments of resident physicians and dentists may be executed by the chief of staff of the University of Illinois Hospital. Purchase orders issued pursuant to awards made by the Board of Trustees may be signed by the university official in charge of the purchasing activity as designated by the vice president/chief financial officer ~~vice president for administration~~. Unless otherwise ordered by the Board of Trustees in specific cases, other contracts to which the University is a party shall be signed by the comptroller of the Board of Trustees and attested to by the secretary of the Board of Trustees.

(d)   Procurement contracts involving expenditures of university funds are governed by *Procurement Rules of the Chief Procurement Officer for Public Institutions of Higher Education* as adopted and amended from time to time by the Board of Trustees. Other university contracts may be awarded to any business entity, including those in which a university officer or employee (or members of their immediate families) serve as major officers or primary employees thereof or hold a significant equity interest therein, if such contract is deemed in the best interests of the University and has the approval of the president or the president's designee. Documentation of such approval shall be filed with the contract.

(e)   When purchases or contracts are to be awarded by the University on the basis of sealed bids, such bids shall be opened in the presence of at least one member or officer of the Board of Trustees or a designated representative.

(f) Purchases, contracts, change orders, and leases involving payments by the University in one fiscal year in excess of such dollar amounts as the Board of Trustees may specify from time to time shall be specifically authorized by the Board of Trustees unless in the opinion of the president of the University necessity requires immediate action, in which case the president shall act to approve the transaction on behalf of the Board of Trustees and report the same promptly to the Board. If the amount involved in such an emergency transaction is in excess of $500,000 but not more than $1,000,000 the president will not approve the transaction without first consulting individually those members of the executive committee of the Board who can reasonably be contacted before the emergency action must be taken. Similar consultation must occur with all Board members who can reasonably be contacted before presidential action on an emergency transaction of over $1,000,000.

(g)   The vice president/chief financial officer ~~vice president for administration~~ is authorized to approve on behalf of the Board of Trustees purchases, contracts, leases, and contract change orders not requiring prior specific Board authorization and shall re-

Exhibit 4 - Page 59 of 85

port such approvals to the Board as the Board may direct. The requirement for specific Board approval above dollar amounts the Board of Trustees may specify does not apply to the execution of or supersede previous actions of the Board authorizing the execution of those types and classes of purchases, leases, and contracts which the Board of Trustees has authorized to be executed without its prior specific approval, such as farm leases, purchases of food products, grain, livestock, fertilizer, natural gas, generic commodities purchased on joint bids with other State institutions, purchases for resale to students and others, and other commodities which the Board may exempt, cultural and entertainment presentations, subcontracts under contracts for research, gifts or grants, University Press publications, and any other transactions which the Board may specify.

(h)   The seal of the University shall be in the custody of the secretary of the Board of Trustees.

(i)   The comptroller and secretary are authorized to delegate to responsible members of the staff of the University authority to execute and attest to contracts in the name of the comptroller and the secretary of the Board.

(j)   All bids received for a specific item or project may be rejected, without referral to the Board of Trustees, when they are considered to be excessive or unsatisfactory as follows:

(1) By a director of purchases, when received as a result of bids solicited by such director for purchases of goods, services, equipment or commodities, such rejections to be reported to the vice president/chief financial officer ~~vice president for administration~~.

(2) By the president, on buildings and construction, upon the recommendation of the vice president/chief financial officer ~~vice president for administration~~, on items over $25,000, such rejections to be reported to the Board of Trustees as the Board may require.

(3) By the vice president/chief financial officer ~~vice president for administration~~, on buildings and construction on items under $25,000, such rejections to be reported to the Board of Trustees as the Board may require.

(k)   The comptroller is authorized to execute subcontracts for research if the costs are to be paid entirely from contract funds and the subcontracts have been approved by the University's prime contractor. In each case, the subcontract shall be reported to the Board of Trustees as the Board may require.

*Section 5. Drafting and Approval of University Contracts*

(a)   Contracts shall be drafted in tentative form by the university officer best acquainted with the subject matter thereof and in whose department lies the responsibility for performance and approved by the vice president/chief financial officer ~~for administration~~ unless otherwise provided by the *Statutes* of the University or by other action of the Board of Trustees.

(b)   All contracts prior to the execution thereof shall be approved as to legal form and validity by the university counsel. Such approval is to be endorsed in writing on the contract, provided that such approval and endorsement shall not be required with respect to individual contracts or extensions or renewals thereof if the form has prior approval by the university counsel as a standard and contains no substantive changes or additions other than those pertaining solely to the description of the project, the amount involved, and the term of the contract or extension.

*Section 6. Research Gifts, Grants, and Contracts*

(a)   Research conducted under the auspices of the University may be supported in whole or in part through funds provided by outside entities in the form of research gifts, research grants, or research contracts. Such arrangements must be approved before acceptance by the president or the president's designee. Staff members may conduct pre-

Exhibit 4 - Page 60 of 85

liminary negotiations with prospective supporters of research with the prior knowledge and approval of the department head or other appropriate administrative officer and the dean or director if required by college policy but have no authority to bind the University to enter into a contract. Such research programs shall be controlled and directed by the University and shall be conducted within the appropriate department(s) by members of the university staff. The administrative coordination of such programs shall be under the Agricultural Experiment Station for units in the College of Agricultural, Consumer and Environmental Sciences; and the Engineering Experiment Station for units in the College of Engineering at the Urbana-Champaign campus, and the Campus Research Board for all other units of the Urbana-Champaign campus, and all units of other campuses. On a campus without a Campus Research Board, the Provost shall be responsible for such administrative coordination.

(b)   Contracts for research shall specify that the results of scientific research conducted by the University, including inventions and discoveries, are the property of the University, to be used for the benefit of the University and the public, but the sponsor may receive preferential consideration in the disposition of the invention or discovery as provided in Article III, Section 7(p).

(c)   Except as may be otherwise specified by the Board of Trustees, the University shall not enter into an agreement with a sponsor which will give a sponsor permanently the exclusive benefits of the results of such investigation or research. The original records of any investigation shall be held by the University, but reports or copies of such records may be furnished to the sponsor. The University shall have the exclusive right to publish, at its discretion, the results of scientific investigation and research unless provided otherwise in contracts with agencies of the United States Government. No account of a cooperative research project or reprints of scientific articles resulting from the investigation shall be published by the sponsor or by any other agency except with the consent of the University. The sponsor shall not use the name of the University in any advertisement, whether with reference to a cooperative investigation or otherwise, without the prior approval of the president of the University or the president's designee.

(d)   If conditions imposed by the sponsor require the waiver of established university policies with respect to reimbursement of indirect costs or rights of publication, such conditions may be accepted by the University if required by Federal law or regulation. Similar conditions may be accepted by the University for any other sponsor when the committee specified in paragraph (f) below determines such acceptance to be clearly in the interests of the University and the public.

(e)   The University accepts funds for research from sponsors outside the University by an outright gift, by a grant, or by a written contract.

(1)  **Research Gifts.**  Gifts for research which are limited in amount may be arranged by informal negotiations and correspondence between the sponsor and the staff member who will carry on the research, subject to acceptance as hereinafter provided. The chancellor at each campus is delegated by the president to approve and accept such gifts for the University. Financial arrangements for gifts shall be reviewed and approved by the Office of Business and Financial Services ~~Affairs~~. Consideration of the direct and indirect costs to the University accruing on account of the acceptance of gifts shall be made at the time of budgeting the funds to be received.

Exhibit 4 - Page 61 of 85

(2) *Research Grants.*  Grants for research are ordinarily made to the University by foundations, associations, or other agencies which are governmental or nonprofit in character.  A research grant is differentiated from a gift in that a grant usually carries certain conditions imposed by the sponsor.  Applications for grants should be prepared by the staff member who will supervise the research, approved by the head or chair of the department and the dean or director if required by college policy, and presented to the Office of Business and Financial Services Affairs for review and approval of financial details.  Applications should be accompanied by a budget which shall give consideration to all direct and indirect costs involved.  After approval by the Office of Business and Financial Services Affairs, applications for grants shall be considered for approval by the chair of the Campus Research Board of the Urbana-Champaign and Chicago campuses.  Grants carrying conditions the legality of which may be questionable shall also be referred to the university counsel.

(3) *Research Contracts.*  Contracts for research shall be used when required by the sponsor or when it is desirable to set forth the specific conditions under which funds are to be received and administered.  The university standard cooperative agreement contract form shall normally be used for projects with private sponsors.  Contracts prepared by the sponsors may be used for projects with agencies of the United States Government, state governments, and in some cases private sponsors.

After informal negotiations with the sponsor, the staff member who is to supervise the project shall prepare a proposal specifying in detail the research work to be carried on and the financial and other conditions. A budget shall be prepared which will provide for all direct costs of the project and the indirect costs to be reimbursed to the University. Such a proposal and accompanying budget shall be approved by the head or chair of the department and the dean or director if required by college policy and submitted to the Office of Business and Financial Services Affairs.  After review and approval by the Office of Business and Financial Services Affairs, it shall be submitted for approval to the vice chancellor for research if such a position exists on the campus.  It shall then be returned to the Office of Business and Financial Services Affairs for submission to the sponsoring agency, such submission to constitute the formal offer of the University to carry on the research subject to the university's requirements for execution of a formal contract.

If the contract is with a private sponsor and the amount involved is relatively small, the university standard contract form may be completed by the staff member and submitted with accompanying budget for university approval in accordance with procedures stated above.  A proposal shall not be required under such conditions.

Contracts prepared by sponsors shall be referred to the Office of Business and Financial Services Affairs for examination as to financial terms and conformance with university policy.

After a proposed contract has been negotiated and reviewed by the Office of Business Affairs and Financial Services, it shall be approved by the department which is to conduct the investigation, the assistant vice president for business and finance, the university counsel, and signed by the comptroller and attested to by the secretary of the Board of Trustees who may authorize responsible members of their staffs to execute contracts on their behalf.

(f)  Gifts, grants, and contracts for research may provide for all or a part of the costs of a research project.  When the funds from the sponsor are to cover all or substantially all of the costs, the following items should be considered in the preparation of the budget: salaries and wages, employer's contribution to the State Universities Retirement System, allowance for Worker's Compensation and Occupational Disease liability,

Exhibit 4 - Page 62 of 85

expendable supplies, equipment, travel expenses, other direct costs, and an allowance for indirect costs to the University. The amount budgeted for indirect costs in any proposed project shall be reviewed and approved by a committee composed of the vice chancellor for research if such a position exists on the campus, if not, the provost; a representative of the appropriate research unit or department carrying on the project and a representative of the Office of Business ~~Affairs~~ and Financial Services. In determining the amount to be budgeted for indirect costs, the committee shall give consideration to the respective benefits which will be received from the investigation by the sponsor, the University, and the public. The expenditure of funds received as reimbursement for indirect costs of research or other university activities, as cost-of-education allowances, as general-support grants ("institutional grants," "general research-support grants," etc.), or as any other category of gift or grant not restricted as to use by the donor or by other regulations of the Board of Trustees requires authorization by the Board of Trustees. This may be done either by: (1) approval as part of the university's annual budgets for operations or for capital improvements, or (2) approval during the fiscal year as an addition to the annual budget for operations or for capital improvements.

(g) The University is often requested to accept grants and contracts providing for extension work or teaching services. Policies and procedures set forth in this section and in Section 7 shall apply to such grants and contracts, except that funds appropriated by the United States Government to the Agricultural Experiment Station or the Illinois Cooperative Extension Service shall be administered by the College of Agricultural, Consumer and Environmental Sciences.

*Section 7. Other Gifts and Grants, Scholarships and Endowments, Nonmonetary Gifts*

(a) *Gifts and Grants.* Gifts and grants for purposes other than research may be accepted from entities outside the University under conditions specified in this Section. Staff members may conduct preliminary negotiations with prospective donors or grantors with the prior knowledge and approval of the department head or other appropriate administrative officers, but are not authorized to bind the University to accept a gift or grant. Gifts are accepted by the president of the University who may delegate the acceptance authority to others.

(b) *Scholarships and Fellowships.* Scholarships are gratuitous payments to students to provide financial assistance during the period of their training. Fellowships are awards involving cash stipends for graduate students. In certain exceptional cases, fellowships may be granted to postdoctoral scholars. Fellowships are intended to assist the recipient pursuing educational objectives; they are not awarded for carrying on specific research, and no services shall be required of a fellow by the University.

The president is authorized to accept funds for scholarships and fellowships. The president may delegate authority for accepting scholarships and fellowships to the chancellors or to the chancellors' designees.

Funds for scholarships and fellowships shall not be accepted under terms which require prohibited discrimination.

When funds are received from a donor for fellowships or scholarships, neither the University nor the student recipients shall be obligated to the donor in any way except to comply with the terms of the gift and to ensure that established academic requirements are met. The recipient of a scholarship or fellowship shall be chosen by appropriate university units in accordance with established criteria based upon scholastic attainment and financial need unless the funds are accepted under other terms.

The vice president/chief financial officer ~~vice president for administration~~ may receive and disburse funds for a donor who wishes to designate the recipient of a grant for financial assistance. In such circumstances, the vice president acts only as the agent of the donor; the funds thus received are not university funds; and the funds thus administered, although perhaps designated as a scholarship or fellowship by the donor, have no official university status.

(c) *Endowment Gifts.* The conditions of the gift as stated by the donor ordinarily specify the use to which the principal and income shall be put although the determination may be left to the Board of Trustees. Gifts may be received and accepted with the

Exhibit 4 - Page 63 of 85

condition that the principal sum thereof shall be either held intact as an endowment or expended upon authorization of the Board of Trustees. The University may temporarily transfer funds to an endowment status to be invested and only the income expended. Such funds are designated as "funds temporarily functioning as endowment" or as "quasi-endowment funds."

The terms of an offer of a gift to create an endowment shall be reviewed by the department concerned, the appropriate campus administrator, the university counsel, and the vice president/chief financial officer ~~vice president for administration~~. The president may accept offers of endowment funds, reporting the gift when received to the Board of Trustees as the trustees may direct. The president may delegate authority to act on such offers to the chancellors. No endowment fund money may be accepted under terms which require prohibited discrimination.

(d) *Nonmonetary Gifts.* Every offer of a non-monetary gift shall be reported by the unit involved to the chancellor of the campus concerned who is authorized to accept the gift on behalf of the president and who shall report it to the president, who shall report it to the Board of Trustees as the trustees may direct.

No object of art shall be accepted until its artistic quality has been determined.

Loans of nonmonetary property are accepted subject to the condition that the University will take reasonable care of the property but will not be responsible for loss or damage thereto unless otherwise agreed to in writing and approved by the vice president/chief financial officer ~~vice president for administration~~.

### Section 8. Technical Tests

(a) The University may undertake specified tests using unique or special university facilities on a contractual service basis for individuals, institutions, or commercial entities (applicants). In general, such tests are justified when the desired facilities do not exist elsewhere or are not readily accessible and when the work to be performed involves only established, preexisting methods of a primarily technical nature which can be specified in advance. A technical testing contract should not be used if the work entails original, creative research. The University will not perform testing for external parties if equivalent service is known to be available and feasibly obtainable from a commercial entity.

(b) The unit executive officer is responsible for determining the appropriateness of the work before the University accepts the contract. Such work will be arranged by the unit executive officer with the involved members of the staff in accordance with the nature of their employment as part of their service to the University unless such work is done at times when services are not required by the University. When necessary or desirable, special assistants may be employed to conduct a specified testing project. Subject to conflict of interest review and prior written approval of the unit executive officer and college dean, testing using university equipment and facilities may also be undertaken by individual members of the university faculty or academic professional employees on their own time and responsibility.

(c) A fee shall be assessed for each testing project sufficient to cover all direct and indirect costs of service rendered, including any and all facilities of the University used in carrying out the test and the technical support personnel necessary to operate it.

(d) Both the testing methods and the objectives toward which they will be applied shall be specified in writing as part of the agreement covering the testing work. The University makes no claim of ownership in observational data, measurements, or other results from such specified testing. In general, it is not anticipated that any new science or technology (and resulting intellectual property) would result from such specified testing. However, in special situations, such as when the proposed testing involves an applicant's proprietary technology or specimens or if a specific objective or application of interest to the applicant which is potentially patentable can be identified in advance, the University may agree not to seek a proprietary position in the applicant's intellectual property. Otherwise, inventions and discoveries (hereafter, "inventions") shall belong solely or jointly to the University and/or to the applicant in accordance with the U.S. laws of inventorship and Article III, Section 3. For any such invention in which the University has an ownership interest, the University will grant the applicant a limited first option to

Exhibit 4 - Page 64 of 85

negotiate a license to use the University invention on reasonable commercial terms.

(e)   The name of the University of Illinois shall not be used in publicity concerning the tests or test results without its prior written permission.

(f)   Technical testing agreements shall be approved and executed in accordance with Article II, Section 5, and the policies and procedures provided for each campus by the assistant vice presidents for business and finance.

### Section 9. Delegation of Signatures

An administrative officer is authorized to delegate to another responsible staff member authority to sign official documents under conditions approved by the vice president/chief financial officer and comptroller for administration.  Such delegation does not relieve the administrative officer of responsibility for what is done there under.

### Article III.  Intellectual Property

1. Objectives
2. Definitions
3. Application
4. Copyrights
5. Other Intellectual Property
6. Trademarks
7. Intellectual Property Administration
8. Proceeds Distribution

### Section 1. Objectives

Technical information, Iinventions, discoveries, copyrightable works and other creative works that have the potential to be brought into practical use may result from the activities of ttUniversity employees in the course of their duties or through the use, by any person, of ttUniversity resources such as facilities, equipment, or funds.

The primary purpose of this intellectual property policy is to provide the necessary protections and incentives to encourage both the discovery and development of new knowledge, and its transfer for the public benefit and its use for development of the economy; a secondary purpose is to enhance the generation of revenue for the University and to provide financial and reputational benefits for and the creator(s):; and a third purpose is to preserve the University's freedom to conduct research and to use the intellectual property created by that research or pursuant to an institutional initiative.  The University is guided by the following general objectives:

(i)   To optimize the environment and incentives for research and for the creation of new knowledge at the University;

(ii)   To ensure that the educational mission of the University is not compromised;

(iii)   To bring technology into practical use for the public benefit as quickly and effectively as possible; and

(iv)   To protect the interest of the people of Illinois through a due recovery by the University of its investment in research a reasonable consideration for the University's investment in its intellectual property.

### Section 2. Definitions

(a)   Intellectual Property.  The term "intellectual property" as used herein is broadly defined to include inventions, discoveries, know-how, show-how, processes, unique materials, copyrightable works, original data and other creative or artistic works which have value.  Intellectual property includes that which is protectable by statute or legislation, such as patents, registered or unregistered copyrights, registered or unregistered trade-

Exhibit 4 - Page 65 of 85

350                          BOARD OF TRUSTEES                    [March 13

marks, service marks, trade secrets, mask works, and plant variety protection certificates. It also includes the physical embodiments of intellectual effort, for example, models, machines, devices, designs, apparatus, instrumentation, circuits, computer programs and visualizations, biological materials, chemicals, other compositions of matter, plants, and records of research and experimental results.

(b)   Traditional Academic Copyrightable Works. "Traditional academic copyrightable works" are a subset of copyrightable works created independently and at the creator's initiative for traditional academic purposes. Examples may include class notes, books, theses and dissertations, educational software (also known as courseware or lessonware), articles, non-fiction, fiction, poems, musical works, dramatic works including any accompanying music, pantomimes and choreographic works, pictorial, graphic and sculptural works, or other works of artistic imagination that are not created as an institutional initiative (as specified in Section 4(a)(2) below).

(c)   Creator. "Creator" refers to an individual or group of individuals who make, conceive, reduce to practice, author, or otherwise make a substantive intellectual contribution to the creation of intellectual property. "Creator" includes the definition of "inventor" used in U.S. patent law for patentable inventions and the definition of "author" used in the U.S. Copyright Act for copy written works of authorship.

(d)   University Resources Usually and Customarily Provided. When determining ownership and license rights in copyrightable works, "uUniversity resources usually and customarily provided" includes such support as office space, library facilities, ordinary access to computers and networks, or salary. In general, it does not include the use of students or employees as support staff to develop the work, or substantial use of specialized or unique facilities and equipment, or other special subventions provided by the University unless approved as an exception.

Exceptions are expected in units where the tradition is to provide subvention to some faculty in the form of graduate assistants to help prepare traditional academic copyrightable works. Exceptions are also expected in situations where creators use uUniversity-provided facilities and resources in the creation of works of artistic imagination, for example, use of studios, pottery wheels, or kilns for the creation of paintings, sculpture or ceramics; use of high end computer hardware and software in the creation of artistic graphical images; and so on. Other individual exceptions may be approved on a case-by-case basis [see section 7(jk)].

### Section 3. Application

This policy as amended from time to time shall be deemed is considered a part of the conditions of employment for every employee of the University and a part of the conditions of enrollment and attendance at the University by students. It is also the policy of the University that individuals (including visitors) by participating in a sponsored research project and/or making significant use of uUniversity-administered resources thereby accept the principles of ownership of intellectual property as stated in this policy unless an exception is approved in writing by the University. All University creators of intellectual property shall execute appropriate assignment and/or other documents required to set forth effectively determine ownership and rights as specified in this policy.[1]

This policy applies only to intellectual property disclosed after the effective date of the policy (September 3, 1998).

---

[1] The creator's obligation to assign rights to the University is subject to the provisions of the Illinois Employee Patent Act, which provides in part:

*A provision in an employment agreement which provides that an employee shall assign or offer to assign any of the employee's rights in an invention to the employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of the employer was used and which was developed entirely on the employee's own time unless (a) the invention relates (i) to the business of the employer, or (ii) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer. Any provision which purports to apply to such an invention is to that extent against the public policy of the state and is to that extent void and unenforceable. The employee shall bear the burden of proof in establishing that his invention qualifies under this subsection.*

Exhibit 4 - Page 66 of 85

*Section 4. Copyrights*

(a)    Ownership.  Unless subject to any of the exceptions specified below or in Section 4(c), creators ~~retain all~~ copyright rights to ~~traditional~~ academic copyrightable works as defined in Section 2(b) above.  (See, however, Sections 4(b)(2) below.)

The University shall own copyrightable works as follows:

(1) Works created pursuant to the terms of a ~~u~~University agreement with ~~an external~~ a third party, or

(2) Works created as a specific requirement of employment or as an assigned ~~u~~University duty that may be specified, for example, in a written job description or an employment agreement.  Such specification may define the full scope or content of the employee's ~~u~~University employment duties comprehensively or may be limited to terms applicable to a single copyrightable work.  Absent such prior written specification, ownership will vest with the University in those cases where the University provides the motivation for the preparation of the work, the topic or content of which is determined by the creator's employment duties and/or when the work is prepared at the ~~u~~University's expense.[1]

(3) Works specifically commissioned by the University.  The term "commissioned work" ~~is hereafter used to describe~~ refers to a copyrightable work prepared under ~~a written~~ an agreement between the University and the creator when (1) the creator is not a ~~u~~University employee, or (2) the creator is a ~~u~~University employee but the work to be performed falls outside the normal scope of the creator's ~~u~~University employment.  Contracts covering commissioned works shall specify that the author convey by assignment, if necessary, such rights as are required by the University.

(4) Works that are also patentable.  The University reserves the right to pursue multiple forms of legal protection concomitantly if available.  Computer software, for example, can be protected by copyright, patent, trade secret and trademark.

(b)    University Rights in Creator-Owned Works

(1) Traditional academic copyrightable works created using ~~u~~University resources usually and customarily provided are owned by the creators.  Such works need not be licensed to the University.

(2) Traditional academic copyrightable works created with use of ~~u~~University resources over and above those usually and customarily provided shall be owned by the creators but licensed to the University.  The minimum terms of such license shall grant the University the right to use the original work in its internally administered programs of teaching, research, and public service on a perpetual, royalty-free, non-exclusive basis.  The University may retain more than the minimum license rights when justified by the circumstances of development.

(c)    Student Works.  Unless subject to the provisions of paragraph (a) or provided otherwise by written agreement, copyrightable works prepared by students as part of the requirements for a ~~u~~University degree program are deemed to be the property of the student but are subject to the following provisions:

(1) The original records (including software) of an investigation for a graduate thesis or dissertation are the property of the University but may be retained by the student at the discretion of the student's major department.

(2) The University shall have, as a condition of the degree award, the royalty-free right to retain, use and distribute a limited number of copies of the thesis, together with the right to require its publication for archival use.

(d)    Copyright Registration and Notice.  University-owned works should be protected by copyright notice in the name of the Board of Trustees of the University of Illinois.  Such copyright notice should be composed and affixed in accordance with the United States Copyright Law.  Registration of the copyright for ~~u~~University-owned works shall be in accordance with the operational guidelines and procedures established by the vice chancellor for research on each campus.  The University may also decide to release

---

[1] Provisions (1) and (2) above define those works that fall within the scope of ~~u~~University employment as that term is used in the definition of "work made for hire" in the U.S. Copyright Statute (see Title 17, USC, Section 101).

Exhibit 4 - Page 67 of 85

352                    BOARD OF TRUSTEES                    [March 13

a work to the public domain and if so, should so indicate.

(e)   University Press Publications.  The University Press shall be responsible for copyright registration of works owned by the University and published by the Press and for administering contracts with its authors.  Such contracts shall define the rights and obligations of the author and the University and shall be processed as ~~are~~ other ~~u~~University contracts.

(f)   Compliance with the Copyright Act.  University units that administer activities involving any usage regulated by the Copyright Act are responsible for knowing applicable regulations, monitoring their continuing evolution, and conducting their programs in full compliance with the applicable laws and regulations.

### Section 5. Other Intellectual Property

Ownership.  Except as otherwise specified ~~herein~~ in this Article or by the University in writing, intellectual property shall belong to the University if made:  (1) by a ~~u~~University employee as a result of the employee's duties or (2) through the use by any person, including a ~~u~~University employee, of ~~u~~University resources such as facilities, equipment, funds, or funds under the control of or administered by the University.  (See also Section 4(a)(4) above.)

### Section 6. Trademarks

Trademarks and service marks are distinctive words or graphic symbols identifying the source, product, producer, or distributor of goods or services.  Registration of trademarks or service marks, at the state or federal level, shall be approved by the appropriate campus or ~~u~~University level officer.  Proceeds received from commercialization of a registered or unregistered mark that is related to an intellectual property license for associated intellectual property will be shared with all creator(s) of the associated property as specified in Sections 8(b) and 8(c) below.  For proceeds received from commercialization of a mark that is licensed independently and is not directly related to an intellectual property license, the share that would normally be distributed to the creator(s) will be assigned to the unit(s) from which the trademark or service mark originated.  Except as provided herein or ~~unless~~ subject to prior written agreement between the creator(s) and the University, the University will not share the proceeds from commercialization of a mark with the individual(s) who created the mark.

### Section 7. Intellectual Property Administration

(a)   Disclosure.  All intellectual property in which the University has an ownership interest under the provisions of this policy and that has the potential to be brought into practical use for public benefit or for which disclosure is required by law shall be reported promptly in writing by the creator(s) to the designated campus officer through the appropriate unit ~~executive officer(s)~~ employee using the disclosure form provided by ~~the campus~~ that unit.  The disclosure shall ~~constitute~~ consist of a full and complete ~~disclosure~~ description of the subject matter of the discovery or development and identify all persons participating therein.  The creator(s) shall furnish such additional information and execute such documents from time to time as may be reasonably requested.

(b)   Evaluation and Exploitation Decisions.  After evaluation of the intellectual property and review of applicable contractual commitments, the University may develop the property through licensing, to an established business or a start-up company, may release it to the sponsor of the research under which it was made (if contractually obligated to do so), may release it to the creator(s) if permitted by law and current University policy, or may take such other actions ~~as are determined~~ considered to be in the public interest.  Exploitation by the University may ~~or may~~ not involve statutory protection of the intellectual property rights, such as filing for patent protection, registering the copyright, or securing plant variety certification.  All agreements regarding intellectual property must be executed by the vice president/chief financial officer and comptroller and attested to by the Secretary of the Board of Trustees or their designees.

(c)   Questions Related to University Ownership.  In the event there is a question as to whether the University has a valid ownership claim in intellectual property, such

Exhibit 4 - Page 68 of 85

intellectual property should be disclosed in writing to the University by the creator(s) in accordance with Section 7(a). Such disclosure is without prejudice to the creator's ownership claim. The University will provide the creator with a written statement as to the ~~u~~University's ownership interest.

(d) Informing Creators of Decisions. The University will inform principal creators of its substantive decisions regarding protection, commercialization and/or disposition of intellectual property which they have disclosed. However, specific terms of agreements with external parties may be proprietary business information and subject to confidentiality restrictions.

(e) University Abandons Intellectual Property. Should the University decide to abandon development or protection of ~~u~~University-owned intellectual property, ownership may be assigned to the creator(s) as allowed by law and current University practice, subject to the rights of sponsors and to the retention of a license to practice for ~~u~~University purposes. The minimum terms of ~~such~~ the license shall grant the University right to use the intellectual property in its internally administered programs of teaching, research, and public service on a perpetual, royalty-free, non-exclusive basis. The University may retain more than the minimum license rights, and the assignment or license may be subject to additional terms and conditions, such as revenue sharing with the University or reimbursement of the costs of statutory protection, when justified by the circumstances of development.

(f) Commercialization ~~by Creator(s)~~. The University may, at its discretion and consistent with the public interest, license intellectual property ~~to the creator(s)~~ on an exclusive or non-exclusive basis. ~~The creator(s)~~ The licensee must demonstrate technical and business capability to commercialize the intellectual property. The license may include clear performance milestones with a provision for recapture of intellectual property if milestones are not achieved. The ~~creator(s)~~ licensee may be required to assume the cost of statutory protection of the intellectual property.

(g) Conflict of Interest and Commitment. Commercialization ~~Agreements with~~ activities involving ~~creators~~ University employees will be subject to review of potential conflict of interest and commitment issues and approval of a conflict ~~of interest issues management plan~~ in accordance with applicable ~~u~~University policy.

(~~g~~h) University's Acceptance of Independently Owned Intellectual Property. The University may accept assignment of intellectual property from other parties provided that such action is determined to be consistent with the public interest. Intellectual property so accepted shall be administered in a manner consistent with the administration of other ~~u~~University-owned intellectual property.

(~~h~~i) Consulting Agreements. University ~~E~~employees engaged in external consulting work or business are responsible for ensuring that agreements emanating from such work are not in conflict with ~~u~~University policy, ~~or~~ with the ~~u~~University's contractual commitments or with University policies regarding University-owned intellectual property. Such employees should make their non-~~u~~University obligations known to ~~others with whom they make such agreements~~ the appropriate campus officer and should provide other parties to such agreements with a statement of applicable ~~u~~University policies regarding ownership of intellectual property and related rights.

(~~i~~j) Statement by Creators. The creators of University-owned intellectual property ~~owned by the University under the terms of this policy~~ may be required to state that to the best of their knowledge the intellectual property does not infringe on any existing patent, copyright or other legal rights of third parties; that if the work is not the original expression or creation of the creators, the necessary permission for use has been obtained from the owner; and that the work contains no libelous material nor material that invades the privacy of others.

(~~j~~k) Administrative Responsibility. The president has ultimate authority for the stewardship of intellectual property developed at the University. Pursuant to Article I, Section 2, Paragraph (d) the vice president for technology and economic development has direct line authority for University offices and entities involved in technology commercialization and related economic development. With the advice of the chancellors, and ~~I~~in consultation with the vice president for academic affairs and the campus vice

Exhibit 4 - Page 69 of 85

chancellors for research, the vice president for technology and economic development ~~will~~ shall establish operational guidelines and procedures for the administration of intellectual property, including but not limited to determination of ownership, assignment, protection, licensing, marketing, maintenance of records, oversight of revenue or equity collection and distribution, approval of individual exceptions, and resolution of disputes among creators and/or unit executive officers.

(~~k~~l) Campus Responsibility. Each campus may establish an office which has responsibility for administering ~~u~~University policies regarding intellectual property as defined ~~herein~~ in this Article.

(~~l~~m) Contractual Authority. Licenses, options for licenses and other agreements related to commercialization or exploitation of intellectual property ~~will~~ shall be granted in the name of the Board of Trustees of the University of Illinois. All such contracts shall be executed in accordance with ~~Article II of these General Rules~~ the policies described in this Article.

(~~m~~n) Administrative Guidelines and Procedures. General guidelines and procedures for the administration of intellectual property shall be established by the president in consultation with the University Intellectual Property Committee (as specified in Section 7(~~n~~o) below) and the campuses. Detailed operational guidelines and procedures for the administration of campus-based responsibilities shall be established by the vice chancellor for research ~~on each campus~~.

(~~n~~o) University Intellectual Property Committee. The University Intellectual Property Committee shall be appointed annually by the president to make recommendations to the president regarding procedures, guidelines, and responsibilities for the administration and development of intellectual property and such other matters as the president shall determine.

(~~o~~p) Appeals. After following the administrative guidelines and procedures established by each campus, the ~~u~~University creator or unit executive officer may appeal to the University Intellectual Property Committee to seek resolution of complaints or questions regarding the matters addressed in this ~~a~~Article.

(~~p~~q) Preferential Treatment of Sponsors. Sponsored research agreements shall provide that all intellectual property developed as a result of the sponsored research project shall belong to the University unless otherwise specified in writing. The sponsor may receive an option to license ~~such~~ the resulting intellectual property on terms to be negotiated, ~~said~~ with the option to be exercised within a specified period following the disclosure of the intellectual property. When the nature of the proposed research allows identification of a specific area of intellectual property or application which is of interest to the sponsor, the University may accept research agreements with terms which entitle the sponsor to underline reasonable specific commercial rights within the defined field of interest. Otherwise, the specific terms of licenses and rights to commercial development shall be based on negotiation between the sponsor and the University at the time ~~of exercise of an~~ the option is executed by the sponsor and shall depend on the nature of the intellectual property and its application, the relative contributions of the University and the sponsor to the work, and the conditions deemed most likely to advance the commercial development and acceptance of the intellectual property. In all cases where exclusive licensing is ~~deemed~~ appropriate, such license agreements shall be executed apart from the sponsored research agreement and shall require diligent commercial development of the intellectual property by the licensee. The University may also determine, on a case-by-case basis and only if allowed by law, that it is in the ~~u~~University's interest to assign ownership of resulting intellectual property to the sponsor as an exception to this policy when circumstances warrant such action, in accordance with guidelines established by the University Intellectual Property Committee.

(~~q~~r) Exceptions to Policy. Recommendations for exceptions to the provisions of the policy in this ~~a~~Article shall be made by the University Intellectual Property Committee to the president for presentation to the Board of Trustees. [For individual exceptions, see Section 7(~~j~~k).]

Exhibit 4 - Page 70 of 85

*Section 8 Proceeds Distribution[1]*

(a)   Proceeds.   For purposes of this policy, "proceeds" shall refer to all revenue and/or equity, as defined below, received by the University from transfer, commercialization, or other exploitation of ~~u~~University-owned intellectual property.

(1)   Revenue.   "Revenue" shall mean cash from payments including, but not limited to, royalties, option fees, license fees, ~~or~~ and/or fees from the sale of the ~~u~~University's equity interest.

(2)   Equity.   "Equity" shall include, but not be limited to, stock, securities, stock options, warrants, buildings, real or personal property, or other non-cash consideration.

(b)   Revenue Distribution.   When revenue is received by the University, all out-of-pocket payments or obligations (and in some cases, a reasonable reserve for anticipated future expenses) attributable to protecting (including defense against infringement or enforcement actions), marketing, licensing or administering the property may be deducted from such income.   The income remaining after such deductions is defined as net revenue.   In the case of multiple intellectual properties licensed under a single licensing agreement, the University shall determine and designate the share of net income to be assigned to each intellectual property.

(1)   Creator's Share.   The creator (or creator's heirs, successors, and assigns) normally shall receive forty percent (40%) of net revenue.   If there are joint creators, the net income shall be divided ~~equally~~ among them ~~absent a mutual agreement to the contrary~~ as they shall mutually agree.   Should the creators fail to agree mutually on a decision, the University shall determine the division.

(2)   Originating Unit's Share.   The originating unit normally shall receive twenty percent (20%) of net revenue.   If a creator is affiliated with more than one originating unit or if there are joint creators from different units, the originating unit(s) share shall be divided among such units as agreed in writing by the responsible unit executive officers.

(3)   University's Share.   The University normally shall receive forty percent (40%) of net revenue.   Distribution of the ~~u~~University's share shall be allocated in support of its technology transfer activities and academic and research programs as determined by the vice chancellor for research.

(c)   Equity Distribution.   In any instance wherein the University executes an agreement with a corporation or other business entity for purposes of exploiting intellectual property owned by the University and the University receives or is entitled to receive equity, ~~such equity or the proceeds of the~~ revenue from the equity shall be shared among the creator(s), the originating unit(s), and the University in the same proportions as revenue distributions (except as specified in Section 8(d) below).

(d)   Exceptions When the Creator(s) Have No Entitlement.   If the University accepts research support in the form of a sponsored research agreement or unrestricted grant as part of the consideration in an intellectual property license in lieu of an option fee, license fee or royalty, the creator(s) shall have no entitlement to receive a share as personal income.   For the subset of equity that is buildings, real or personal property, or other non-cash consideration, the creator(s) shall have no entitlement to receive a share as personal income.

(e)   Special Distributions.   Special facts or circumstances may warrant a different distribution of proceeds than specified above and such distributions will be determined on a case-by-case basis under the authority of the vice chancellor for research.

(f)   Revenue from Actions for Defense or Enforcement of Intellectual Property Rights.   When the University receives revenue from third parties that results from successful actions for the purpose of defending or enforcing the ~~u~~University's rights in its intellectual property, such revenue may first be used to reimburse the University (or

---

[1] These proceeds distribution provisions shall apply only to revenue and equity received from agreements for commercialization that are executed subsequent to the effective date of this policy (September 3, 1998).   Unless otherwise agreed in writing between the University and the creator(s), distribution of income for commercialization prior to the effective date of this policy shall be in accordance with the policy in effect at the time the agreement was approved.   Where no policy exists (e.g., for equity), this policy shall prevail.

Exhibit 4 - Page 71 of 85

the sponsor or licensee, if appropriate) for expenses incurred in such actions. The creator(s) and their originating unit(s) shall be entitled to recovery of lost royalties from the remaining net revenue, in the same proportions as specified in Section 8(b) above. The remaining net revenue shall be allocated in support of the ~~the~~ University's technology transfer activities and academic and research programs as determined by the vice chancellor for research.

### Article V.   University Property

*Section  1. Use of University Premises and Facilities*

(a)   The use of ~~the~~ University premises and facilities shall be subject to all applicable State and Federal laws and shall also be in accord with the actions of the Board of Trustees.

(b)   The use of ~~the~~ University premises and facilities by individuals other than in connection with ~~the~~ University educational or research programs will be permitted only under regulations formulated and administered by the appropriate chancellor and approved by the president.  <u>A facilities use agreement, articulating the terms of use, should reflect the conditions deemed most likely to advance the development and acceptance of the intellectual property.</u>

(c)   The president ~~of the University~~ is authorized to make such traffic and parking regulations and such changes therein as conditions may warrant ~~from time to time~~ and may delegate such authority to the chancellors.

*Section  2. Custodianship of Property*

(a)   Under the State Property Control Act, the president ~~of the University~~ is accountable to state officials for the supervision, control, and inventory of all ~~the~~ University property subject to that act.  In discharging these and other responsibilities, the president is authorized to specify or to deputize the chancellors and other ~~the~~ University officers to specify procedures and responsibilities for the supervision, control, and inventory of all ~~the~~ University property.

(b)   Unless otherwise specified, the supervision, control, and inventory of ~~the~~ University personal property shall be the responsibility of the head of the unit to which the property is assigned.  An inventory of all such property shall be maintained in a manner determined by the vice president and chief financial officer/comptroller and the vice president and chief financial officer/comptroller may require reports concerning the same.  The individual responsible shall report to the comptroller all items of ~~the~~ University personal property which are of no further use to the department, and the vice president and chief financial officer/comptroller may transfer the same to another unit or direct other disposition.

(c)   Land which has been assigned by the Board of Trustees to a college or department for particular use or for a definite period may not be used for any other purpose or beyond the period designated without authorization by the Board of Trustees.  The assignment of land, equipment, or any other property to a department or division does not give the department a title to the same, but only the right to use as long as necessary for accomplishing the function of the department or division; and the use of land or equipment or other property shall not exclude its use, at the same time, for other purposes by other departments or divisions of the University on approval of the president provided that any such second use shall not interfere with the efficient utilization of said land, equipment, or other property for the purpose for which it was first assigned.

*Section  3. Private Use of University Property ~~Forbidden~~*

No one connected with the University in any capacity shall use for any personal purpose any ~~the~~ University property of whatever description, and no one shall be permitted to remove from the buildings or grounds any property belonging to the University, even though it may seem to be of no value, unless it be temporarily removed pursuant to some well-established regulation, or with the approval of the appropriate chancellor or the <u>vice president/chief financial officer</u> ~~for administration~~ in the instance of ~~the~~ University-level property.

Exhibit 4 - Page 72 of 85

*Section 4. Naming of University Facilities and Programs; Commemorative Plaques and Tablets*

(a)   University "Facilities" refers to any building, structure, street, drive, landscaped area, open space, physical improvement, or other property under the administrative control of the University.  "Programs" refers to any academic or non-academic program, school, college, institute, center, etc., but does not include endowed faculty positions such as chairs or professorships.

(b)   Insofar as consistent with State law, the naming of University Facilities and Programs lies within the authority of the Board of Trustees and shall require Board approval except as specifically described in paragraph (e) below.

(c)   University Facilities and Programs may be named for the following:

(1) Donors who have made substantial contributions toward financing the construction, renovation or remodeling of a Facility or an addition thereto; or establishing, advancing or maintaining a Program;

(2) An honoree nominated by such a donor and approved by the Board of Trustees;

(3) Distinguished persons in the public life of the State of Illinois or the nation;

(4) Distinguished former members of the Board of Trustees; or

(5) Former members of the University, faculty, staff, or administration.

In addition, the Board may approve the naming of a University facility or program in situations other than those described above when the Board, in its discretion, determines that the interests of the University are served in doing so.

(d)   Buildings should be named in such a way as to denote their general use; such names may include a designation such as auditorium, gymnasium, hall, laboratory, or school.

(e)   Notwithstanding the above provisions, commemorative plaques or tablets may be installed inside buildings near spaces such as rooms, lounges, laboratories, performance spaces and lecture halls in recognition of:

(1) Distinguished members of the University faculty, staff, or administration whose services were identified with the functions of said spaces; or

(2) Donors of funds (or an honoree designated by the donor) where the contribution was substantial in financing the renovation or remodeling of said spaces.  Any such plaque or tablet must be approved by the appropriate chancellor but does not require Board approval.

(f)   The Chancellors may develop for their respective campuses procedures for internal review and approval prior to the submission of items to the Board for its consideration.

On motion of Dr. Schmidt, this recommendation was approved.

By consensus, the Board agreed that one roll call vote would be taken and considered the vote on each agenda item nos. 33 through 44 inclusive. The recommendations were individually discussed but acted upon at one time.

(The record of Board action appears at the end of each item.)

## Interest Rate Swap in Anticipation of the Issuance of Certain Health Services Facilities System Revenue Refunding Bonds

(33)  The Board of Trustees of the University of Illinois (the "Board"), at its meeting on April 11, 2006, authorized a number of actions leading toward the issuance of certain variable rate demand Health Services Facilities System Revenue Refunding Bonds (the "Bonds") to refund the Health Services Facilities System Revenue Bonds, Series 1997A. Certain actions have been completed including:  retention of Katten Muchin Rosenman LLP as bond counsel; retention of Freeborn & Peters LLP as special issuer's counsel; retention of Scott Balice Strategies, LLC as financial advisor; retention of Goldman, Sachs

Exhibit 4 - Page 73 of 85

& Co. as managing underwriter; retention of The Bank of New York Trust Company, N.A., successor to J. P. Morgan Trust Company, National Association, as bond registrar; the analysis of the purchase of bond insurance and a standby liquidity facility, where such insurance will be purchased by the managing underwriter; and actions to pursue and obtain ratings on the revenue refunding bonds.

It is requested that the Board authorize the issuance of a forward starting variable-to-fixed interest rate swap in a notional amount not to exceed $45.0 million with a termination date no later than October 1, 2026, in anticipation of the issuance of the bonds. The documentation to be executed by the Board in connection with the interest rate swap is expected to include the International Swap Dealers Association, Inc. (the "ISDA") Master Agreement and the Schedule and Credit Support Annex thereto, each of which, and any related documents, are authorized hereby. The average annual payments to the bondholders and swap counterparty are expected to be approximately $3.5 million over the life of the interest rate swap.

The bonds will be sold via a negotiated sale and will be authorized at a later time. The interest rate swap will be competitively bid. The interest rate swap will be a special, limited obligation of the Board and will be payable from the same sources as the bonds. The bonds will be payable from the following sources on a parity basis with the Health Services Facilities System, Series 1997B and other parity bonds (collectively, the "parity bonds") hereafter issued pursuant to the bond resolution for the 1997B bonds, as supplemented (the "bond resolution"): (1) the net revenues of the Health Services Facilities System; (2) Medical Service Plan revenues in an amount not to exceed in any fiscal year the amount of debt service requirements on the bonds and any parity bonds and any mandatory transfers as described in the bond resolution for such fiscal year; and (3) College of Medicine student tuition in an amount not to exceed in any fiscal year the amount of debt service requirements on the bonds and any parity bonds and any mandatory transfers as described in the bond resolution for such fiscal year, subject to the prior pledge in favor of certain other bond issues.

All legal matters incidental to the authorization and issuance of the bonds will be approved by Katten Muchin Rosenman LLP, Chicago, Illinois, bond counsel; and all legal matters incidental to the authorization of the interest rate swap will be approved by Freeborn & Peters LLP, Chicago, Illinois, special counsel to the University. Certain legal matters in connection with the bonds will be passed upon by Mayer, Brown, Rowe & Maw LLP, Chicago, Illinois, underwriter's counsel.

The vice president and chief financial officer recommends that the Board:

1. Authorize entering into the interest rate swap.

2. Approve the form of the ISDA Master Agreement, Schedule, Credit Support Annex and Confirmation, in substantially the form submitted to this meeting, with a fixed payment by the Board to a counterparty to be determined at a rate not exceeding 5.50 percent per annum and a termination date no later than October 1, 2026.[1]

3. Delegate to the comptroller the authority to determine the notional amount and final terms of the interest rate swap within the limits expressed in this Board action.

---

[1] A copy is filed with the secretary of the Board for record and the appropriate officers of the Board are hereby authorized and directed to execute the same in the name of and on behalf of the Board in substantially the form presented to this meeting, or with such changes as may be approved by the officer or officers of the Board executing the same, his/her or their execution thereof to constitute conclusive evidence of the Board's approval of all changes from the form thereof presented to this meeting; provided, however, that if any such changes constitute a substantial change in the form thereof presented to this meeting they shall first be approved by the executive committee of the Board to which authority for such approval is delegated by the Board.

Exhibit 4 - Page 74 of 85

4. Ratify and confirm all actions taken or to be taken by the officers and members of the Board in connection with the sale and delivery of the interest rate swap.

5. Authorize and empower the comptroller and other officers of the Board to do and perform such other acts and things; and to make, execute, and deliver all such other instruments and documents on behalf of the Board as may be by them deemed necessary or appropriate in connection with the provisions of the interest rate swap agreement, and all acts and things whether heretofore or hereafter done or performed by and of the officers of the Board which are in conformity with the intents and purposes of these resolutions shall be and the same are hereby in all respects, ratified, confirmed, and approved.

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure,* and Board of Trustees policies and directives.

The president of the University concurs.

On motion of Dr. Schmidt, these recommendations were approved by the following vote:  Aye, Mr. Bruce, Dr. Carroll, Mr. Dorris, Ms. Doyle, Mr. Eppley, Mr. Montgomery, Dr. Schmidt, Mr. Shah; no, none; absent, Governor Blagojevich, Mr. Vickrey.  (Mr. Sperling asked to be recorded as not voting on this item.)

(The student advisory vote was: Aye, Mr. Kantas, Mr. Staren; no, none.)

### Award Contract for Code Correction, College of Dentistry, Chicago

(34)  This $1.25 million project has been approved to correct deficiencies in the College of Dentistry.  This project upgrades the fire alarm system and corrects various code deficiencies such as installation of fire stops, smoke dampers, and correction of existing conditions required by current codes.

The chancellor at Chicago with the concurrence of the appropriate administrative officers recommends that the construction contract for the code correction work be awarded.  Competitive bidding procedures in accordance with the Illinois Procurement Code were followed; and the award is to the lowest responsible bidder on the basis of its base bid plus the acceptance of the indicated alternate.[1]

*Division V—Electrical Work*

| | | |
|---|---|---|
| McWilliams Electric Co., Inc., | Base Bid | $905,916 |
| Schaumburg, IL | Alternate E-1 | 81,507 |
| *Total* | | $987,423 |

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure,* and the Board of Trustees policies and directives.

Funds for this project are available from the sale proceeds of the Certificates of Participation (Academic Facilities Projects), Series 2006A.

The president of the University concurs.

A schedule of the bid received has been filed with the secretary of the Board for record.

On motion of Dr. Schmidt, this recommendation was approved by the following vote:  Aye, Mr. Bruce, Dr. Carroll, Mr. Dorris, Ms. Doyle, Mr. Eppley, Mr. Montgomery, Dr. Schmidt, Mr. Shah, Mr. Sperling; no, none; absent, Governor Blagojevich, Mr. Vickrey.

(The student advisory vote was: Aye, Mr. Kantas, Mr. Staren; no, none.)

---

[1] Description of Alternates:  Alternate E-1 installs new fire alarm system while maintaining existing system operational.

Exhibit 4 - Page 75 of 85

## Award Contracts for Research Space for Behavioral Neurobiology, Chicago

(35)  This $6.6 million project has been approved for remodeling 22,000 gross square feet of existing laboratory and office space on the second and third floors of the Psychiatric Institute for uses for behavioral neurobiology laboratories and support space. The existing space has not been remodeled since the construction of the building in 1959. It will include a complete gutting of the space in order to provide modifications to the plumbing, heating, ventilating, and air conditioning, fire alarms, telecommunications, and sprinkler systems.  In addition, a new laboratory exhaust system will be installed and a new air handling unit installed to serve the second and third floors.

The chancellor at Chicago with the concurrence of the appropriate administrative officers recommends that the following contracts[1] for construction be awarded.  Competitive bidding procedures in accordance with the Illinois Procurement Code were followed; and the award is to the lowest responsive and responsible bidders on the basis of its base bid plus the acceptance of indicated alternates.[2]

*Division I—General Work*

| | | |
|---|---|---|
| Poulos, Inc., | Base Bid | $1,377,000 |
| Chicago, IL | Alternate G-2 | 52,000 |
| | Alternate G-4 | 26,000 |
| | Alternate G-5 | 5,000 |
| *Total* | | $1,460,000 |

*Division IV—Ventilation Work*

| | | |
|---|---|---|
| Stern Corporation, | Base Bid | $  997,000 |
| Harvey, IL | Alternate V-1 | 20,000 |
| | Alternate V-2 | 0 |
| | Alternate V-3 | 9,700 |
| | Alternate V-6 | 34,000 |
| | Alternate V-9 | 15,000 |
| *Total* | | $1,075,700 |

---

[1] Contracts for divisions that were awarded within the delegated approval levels:  Division II (Plumbing Work)—A & H Plumbing and Heating Co., Elk Grove Village, IL—$378,000; Division III (Heating A/C Work)—Monaco Mechanical, Inc., Westmont, IL—$495,200; and Division XXXVI (Telecommunications Work)—Low Voltage Solutions, Inc., Downers Grove, IL—$102,227.

[2] Description of Alternates:  Alternate G-2 furnishes and installs new pre-manufactured sound conditioning room (IAC), new concrete ramp and handrails, and associated work including fire protection; Alternate G-4 furnishes and installs new sheet vinyl flooring in lieu of vinyl composition tile in selected rooms; Alternate G-5 furnishes and installs alternate drawer configuration for metal base cabinet; Alternate V-1 furnishes and installs additional duct silencers in selected locations; Alternate V-2 furnishes and installs ventilation work associated with new pre-manufactured sound conditioning room; Alternate V-3 furnishes and installs ventilation work associated with the chilled glycol water system extension; Alternate V-6 furnishes and installs ventilation work associated with a new redundant exhaust fan LEF-2; Alternate V-9 provides fan wall technology in lieu of the fan types and arrangements noted on the base bid drawings; Alternate E-2 furnishes and installs electrical work associated with new pre-manufactured sound conditioning room; Alternate E-3 furnishes and installs electrical work associated with the chilled glycol water system extension; Alternate E-6 furnishes and installs electrical work associated with a new redundant exhaust fan LEF-2; Alternate E-9 provides deduction for furnishing and installing the supply fan variable fan drives, wiring from the variable fan drive motors and any cost changes associated with the electrical connection to the air handling unit compared to the base bid electrical connections to the variable fan drives; Alternate TC-2 furnishes and installs temperature control work associated with new pre-manufactured sound conditioning room; Alternate TC-3 furnishes and installs temperature control work associated with the chilled glycol water system extension; Alternate TC-6 furnishes and installs temperature control work associated with a new redundant exhaust fan LEF-2; and Alternate TC-8 provides the constant volume air valves with controls.

Exhibit 4 - Page 76 of 85

*Division V—Electrical Work*

| | | |
|---|---|---|
| Argo Electric Inc.,[1] | Base Bid | $722,000 |
| Villa Park, IL | Alternate E-2 | 1,400 |
| | Alternate E-3 | 1,800 |
| | Alternate E-6 | 4,900 |
| | Alternate E-9 | -13,500 |
| *Total* | | $716,600 |

*Division VII—Temperature Control Work*

| | | |
|---|---|---|
| Convergint Technologies LLC, | Base Bid | $495,000 |
| Schaumburg, IL | Alternate TC-2 | 0 |
| | Alternate TC-3 | 1,200 |
| | Alternate TC-6 | 2,500 |
| | Alternate TC-8 | 40,000 |
| *Total* | | $538,700 |

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure*, and the Board of Trustees policies and directives.

Funds are available from a National Institute of Health grant and institutional funds operating budget of the Office of the Provost and the College of Medicine.

The president of the University concurs.

A schedule of the bids received has been filed with the secretary of the Board for record.

On motion of Dr. Schmidt, these contracts were awarded by the following vote: Aye, Mr. Bruce, Dr. Carroll, Mr. Dorris, Ms. Doyle, Mr. Eppley, Mr. Montgomery, Dr. Schmidt, Mr. Shah, Mr. Sperling; no, none; absent, Governor Blagojevich, Mr. Vickrey.

(The student advisory vote was: Aye, Mr. Kantas, Mr. Staren; no, none.)

## Award Contract For East Side Chilled Water Distribution Improvements, Chicago

(36) In November 2005, the Board approved a $3.4 million project for chilled water distribution improvements for the east side of the Chicago campus. This recommended project would provide an extension of the chilled water distribution system on the east side of the campus to serve the south campus, and to complete the system loop to support the South Campus Mixed Use Development project as well as the new Advanced Chemical Technologies Building. As a result of this extension, campus-wide distribution of chilled water, service availability, and reliability will be improved.

The vice president/chief financial officer with the concurrence of the appropriate administrative officers recommends that the contract for the utility site work and heating work be awarded. Competitive bidding procedures in accordance with the Illinois Procurement Code were followed; and the award is to the lowest responsible bidder on the basis of its base bid.

*Division 31—Utility Site Work/Heating*

| | | |
|---|---|---|
| Reliable Contracting & Equipment | Base Bid | $2,878,000 |
| Company, Chicago, IL | | |
| *Total* | | $2,878,000 |

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure*, and the Board of Trustees policies and directives.

Funds for this project are available from the institutional funds operating budget of the Chicago campus.

---

[1] Argo Electric, Inc., is the second lowest bidder. The lowest bidder, Phillips Electric, Inc., withdrew their bid due to clerical errors.

Exhibit 4 - Page 77 of 85

BOARD OF TRUSTEES [March 13

The president of the University concurs.

A schedule of the bids received has been filed with the secretary of the Board for record.

On motion of Dr. Schmidt, this recommendation was approved by the following vote: Aye, Mr. Bruce, Dr. Carroll, Mr. Dorris, Ms. Doyle, Mr. Eppley, Mr. Montgomery, Dr. Schmidt, Mr. Shah, Mr. Sperling; no, none; absent, Governor Blagojevich, Mr. Vickrey.

(The student advisory vote was: Aye, Mr. Kantas, Mr. Staren; no, none.)

### Award Contract for South Campus Chilled Water Improvements, Urbana

(37) This $4.68 million project will provide professional design and construction services for the Urbana campus for utility improvements needed to accommodate recent development of the south side of the campus. The capacity of this new system will provide for increased demands for cooling for new or expanded facilities including Memorial Stadium, the Assembly Hall, the Research Park hotel/restaurant and conference center, a future Olympic sports facility, and other University projects identified in the master plan. The work consists of the construction of piping systems for chilled water supply and return distribution, raw water distribution, compressed air distribution, sewage force main piping, and associated appurtenances.

The chancellor at Urbana with the concurrence of the appropriate administrative officers recommends that the Board approve for award the following contract to the lowest responsible bidder on the basis of its discounted bid which includes the base bid plus acceptance of all alternates.[1] Competitive bidding procedures in accordance with the Illinois Procurement Code were followed.

*Division 34—Utilities Site Work*

| A & R Mechanical Services, Inc., | Base Bid | $2,984,676 |
|---|---|---|
| Urbana, IL | Alternate 1 | 70,207 |
| | Alternate 2 | 420,473 |
| | Alternate 3 | 159,444 |
| *Total* | | $3,634,800 |
| | | |
| Discounted Bid | | $3,457,989 |

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure,* and the Board of Trustees policies and directives.

Funds for this project are available from the institutional funds operating budget of the Urbana campus.

The president of the University concurs.

A schedule of the bids received have been filed with the secretary of the Board for record.

On motion of Dr. Schmidt, this recommendation was approved by the following vote: Aye, Mr. Bruce, Dr. Carroll, Mr. Dorris, Ms. Doyle, Mr. Eppley, Mr. Montgomery, Dr. Schmidt, Mr. Shah, Mr. Sperling; no, none; absent, Governor Blagojevich, Mr. Vickrey.

(The student advisory vote was: Aye, Mr. Kantas, Mr. Staren; no, none.)

---

[1] Description of Alternates: Alternate 1 provides the force main extension to manhole at the southwest corner of the hotel/conference center lot; Alternate 2 provides chilled water, raw water, and compressed air extension (large pipe) to the conference center and manhole; and Alternate 3 provides chilled water, raw water, and compressed air extension (reduced pipe) to the conference center.

Exhibit 4 - Page 78 of 85

### Award Contracts for Conference Center, Urbana

(38)  In September 2005, the Board approved the construction of a Conference Center at Urbana to serve as an amenity for the University of Illinois Research Park and as an asset to the colleges and departments of the Urbana campus including the Division of Intercollegiate Athletics.  Planned uses include academic conferences, seminars, and professional association meetings.  The Conference Center will be located on the southeast corner of St. Mary's Road and First Street, just south of the Assembly Hall.

The chancellor at Urbana with the concurrence of the appropriate administrative officers recommends that the Board approve for award the following construction contracts[1] to the lowest responsible bidder on the basis of its base bid plus acceptance of the indicated alternates.[2]  Competitive bidding procedures in accordance with the Illinois Procurement Code were followed.

*Division 1—General Work*

| Broeren Russo Construction, Inc., | Base Bid | $5,375,000 |
|---|---|---|
| Champaign, IL | Alternate 1 | 35,000 |
| | Alternate 7 | -6,500 |
| | Alternate 8 | 6,000 |
| | Alternate 9 | 15,000 |
| *Total* | | $5,424,500 |

*Division 4—Ventilation Work*

| A & R Mechanical Contractors, Inc., | Base Bid | $622,000 |
|---|---|---|
| Urbana, IL | | |
| *Total* | | $622,000 |

*Division 5—Electrical Work*

| Egizii Electric, Inc., | Base Bid | $997,700 |
|---|---|---|
| Decatur, IL | | |
| *Total* | | $997,700 |

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure*, and the Board of Trustees policies and directives.

Funds for this project are available from Auxiliary Facilities System funds and institutional funds operating budget of the Urbana campus with anticipated reimbursement from the proceeds of a subsequent revenue bond sale.  Any project costs incurred prior to the sale of the revenue bonds will be funded initially from other Auxiliary Facilities System or institutional funds of the Urbana campus.

The president of the University concurs.

A schedule of the bids received have been filed with the secretary of the Board for record.

On motion of Dr. Schmidt, these contracts were awarded by the following vote: Aye, Mr. Bruce, Dr. Carroll, Mr. Dorris, Ms. Doyle, Mr. Eppley, Mr. Montgomery, Dr. Schmidt, Mr. Shah, Mr. Sperling; no, none; absent, Governor Blagojevich, Mr. Vickrey.

(The student advisory vote was:  Aye, Mr. Kantas, Mr. Staren; no, none.)

---

[1] Contracts for divisions that were awarded within the delegated approval levels:  Division 2 (Plumbing Work)–Davis-Houk Mechanical, Inc., Urbana, IL–$269,000; Division 3 (Heating, Piping, Refrigeration & Temperature Control Work)–Davis-Houk Mechanical, Inc., Urbana, IL–$293,750; and Division 6 (Sprinkler Work)–Superior Fire Protection, Inc., Forsyth, IL–$92,500.

[2] Description of Alternates:  Alternate 1 adds decorative rolling gate and structure to service court; Alternate 7 deletes connecting drive on southwest corner of east parking lot; Alternate 8 changes all wood to walnut; and Alternate 9 provides dimensional stone tile in lieu of porcelain ceramic tile and recessed concrete and median.

Exhibit 4 - Page 79 of 85

### Award Contract for Library and Undergraduate Library Improvement (Sprinklers) Project, Urbana

(39)  This $4.0 million project is for the installation of fire suppression systems (sprinklers) in the stacks of the Main Library and Undergraduate Library to protect occupants and rare and valuable resources.  The work recommended would include sprinkler protection for the library stacks (all levels including attic), a preaction type sprinkler system and detection system for the Rare Book Room and manuscript area within the library, sprinkler protection for the entire Undergraduate Library and the connecting tunnel, and replacement of all "on/off" sprinklers in the sixth stack addition of the library.  In addition, new dropped ceilings and lighting are planned for the Undergraduate Library plaza level pavilions, removal of an existing dumbwaiter in the library stacks, increased electrical power for new equipment and lights, a new fire alarm panel in the library, and minor modifications to lighting the library stacks are also included.

The chancellor at Urbana with the concurrence of the appropriate administrative officers recommends that the Board approve for award the following contract[1] to the lowest responsible bidder in each division on the basis of its base bid plus acceptance of the indicated alternates.[2]  Competitive bidding procedures in accordance with the Illinois Procurement Code were followed.

*Division 6—Sprinkler Work*

| | | |
|---|---|---|
| Fire Suppression Systems, | Base Bid | $1,870,000 |
| Champaign, IL | Alternate 1 | 138,000 |
| | Alternate 2 | 141,100 |
| | Alternate 3 | 70,000 |
| | Alternate 4 | 87,200 |
| | Alternate 5 | 117,000 |
| *Total* | | $2,423,300 |

The Board action recommended in this item complies in all material respects with applicable State and federal laws, University of Illinois *Statutes, The General Rules Concerning University Organization and Procedure*, and the Board of Trustees policies and directives.

Funds for this project are available from the institutional funds operating budget of the Urbana campus.

The president of the University concurs.

A schedule of the bids received have been filed with the secretary of the Board for record.

On motion of Dr. Schmidt, this recommendation was approved by the following vote:  Aye, Dr. Carroll, Mr. Dorris, Ms. Doyle, Mr. Eppley, Mr. Montgomery, Dr. Schmidt, Mr. Shah, Mr. Sperling; no, none; absent, Governor Blagojevich, Mr. Vickrey.  (Mr. Bruce asked to be recorded as not voting on this item.)

(The student advisory vote was:  Aye, Mr. Kantas, Mr. Staren; no, none.)

### Approve Project for Lincoln Hall Renovation, Chicago

(40)  Lincoln Hall is one of nine similar three-story buildings on the east side of the Chicago campus which was part of the original campus construction.  This program proposes renovation of the interior spaces of Lincoln Hall and complete replacement of the exterior walls, mechanical, electrical, and plumbing systems.  The renovated facility will

---

[1] Contracts for divisions that were awarded within the delegated approval levels:  Division 1 (General Work)–Commercial Builders, Inc., Champaign, IL–$207,500; and Division 5 Electrical Work–Coleman Electrical Service, Inc., Mansfield, IL–$85,230.

[2] Description of Alternates:  Alternate 1 provides wet automatic sprinkler protection for Main Library basement; Alternate 2 provides wet automatic sprinkler protection for Main Library first floor; Alternate 3 provides wet automatic sprinkler protection for Main Library second floor; Alternate 4 provides wet automatic sprinkler protection for Main Library third floor; and Alternate 5 provides wet automatic sprinkler protection for Main Library fourth floor.

Exhibit 4 - Page 80 of 85