**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, | |
| Plaintiff, | Case No. 21-cv-6546 |
| v. | Judge John Robert Blakey |
| VINTAGE BRAND, LLC and SPORTSWEAR INC. d/b/a PREP SPORTSWEAR, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Board of Trustees of the University of Illinois (the "University" or "Plaintiff") sues Defendant Vintage Brand, LLC ("Vintage Brand") and Defendant Sportswear Inc. d/b/a Prep Sportswear ("Sportswear") (together with Vintage Brand, "Defendants") for allegedly infringing its trademark rights in U.S. Reg. No. 2,232,024 (the "Chief Logo"). [65]. Vintage Brand now moves for partial summary judgment on its affirmative defense that the University abandoned the Chief Logo. [68]. For the reasons explained below, the Court denies the motion [68].

**I. Background**

**A. Factual Background**[1]

For decades, one of the logos associated with the University of Illinois Urbana-Champaign's athletic programs was an image of a face wearing a Native American

---

[1] The Court draws the background facts from the parties' statements of material facts, responses thereto, and cited records. [70]; [107]; [108]; [113].

headdress. This image was referred to as "Chief Illiniwek" and, for a period, also represented the University of Illinois' mascot.

This lawsuit centers on the Chief Logo, a version of that logo, which is trademarked as U.S. Reg. No. 2,232,024 and which the University used in connection with its educational services, athletic performances, and apparel and merchandise since as early as 1994. [108] ¶18. Since at least 2002, Plaintiff has licensed the Chief Logo through Collegiate Licensing Company ("CLC"). *Id.* ¶¶1–2. CLC maintains a standard licensing program for licensing many of Plaintiff's trademarks. *Id.* Since 2007, Plaintiff has also operated a College Vault program through CLC to license legacy marks that no longer represent the University's athletic programs. *Id.* ¶3.

In 2005, the National Collegiate Athletic Association ("NCAA") adopted a policy prohibiting NCAA colleges and universities from displaying certain imagery deemed hostile and abusive to Native American cultures. [113] ¶ 1. The NCAA identified Plaintiff as one of eighteen universities displaying prohibited Native American imagery in connection with NCAA competitions. [107] ¶ 2.

On March 13, 2007, Plaintiff approved a resolution directing "the immediate conclusion to the use of Native American imagery as the symbol of the University of Illinois and its intercollegiate athletics along with the related regalia, logo, and the names 'Chief Illiniwek' and 'Chief.'" [107] ¶5, [70-4] at 8. It gave responsibility to the University's Chancellor over "the final disposition" of the Chief Logo, including "trademark and licensing issues." *Id.*

On March 30, 2007, Plaintiff also announced to its licensees that it would "eliminate or import strict limitations on the use of Native American imagery as the symbol for the University of Illinois." [107] ¶ 6; [70-5]. Retailers could order merchandise with the Chief Logo through April 16, 2007, but such merchandise would not ship beyond December 31, 2007. *Id*. Chief Logo merchandise remained in retail stores until at least 2010, however, and the University's announcement stated that it planned "to maintain its trademark ownership rights in the Chief logo." *Id*.

In 2008, Plaintiff added the Chief Logo to its College Vault Program. [107] ¶ 20. Since mid-2007, Plaintiff has not actively licensed the Chief Logo through any means other than its College Vault Program. [107] ¶ 36. Since 2009 through the present, licensees through the College Vault Program continue to sell online certain vintage-themed Chief Logo products. [113] ¶¶ 9, 11. Specifically, in December 2018, there were eight apparel and merchandise manufacturers licensed under the College Vault Program. [107] ¶¶ 23–24.

The College Vault Program licenses only allow licensees to sell merchandise with the Chief Logo online, and Plaintiff considers it a "serious issue" if a licensee breaks this policy. [107] ¶¶ 25, 34. Some licensees and retailers advertise their Chief Logo products online. [113] ¶ 17. Licensed Chief Logo products have the Chief Logo trademark affixed with the ® adjacent to the Chief Logo image. *Id.* ¶10; [108-13] at 9; [108-18]. The products also often contain language indicating they are officially licensed—one site, for example, advertises a Chief Logo product as an "officially licensed collegiate product." *Id*.

The University does not give licenses to local companies to print the Chief Logo. [70] ¶ 30. In fact, in 2013, the University rejected a local store's proposal to install a dedicated computer for Chief Logo merchandise. *Id.* ¶ 29; [107] ¶ 29. In addition, students and groups affiliated with the school may not use the Chief Logo. [107] ¶ 30.

Between Q3 2013 and Q2 2022, licensed retailers manufactured, distributed and sold 27,249 products with the Chief Logo, netting $449,749.47 in sales. [113] ¶ 15. For each annual period during that time, retailers sold at least 600 units of Chief Logo product with $7,639.20 in net sales, and at least $1,292.35 in royalties for Plaintiff. *Id.* ¶¶ 14–15. From Q3 2009 through Q2 2022, Plaintiff received approximately $112,370.59 in royalties from licensing the Chief Logo. *Id.* ¶ 14. Overall, however, no more than 0.6 percent of the University's aggregate licensing revenue comes from the Chief Logo license royalties. [107] ¶ 43.

Since 2007, University officials have repeatedly disavowed the use of the Chief Logo as a representation of the University. Two University Chancellors stated that the Chief Logo "is not coming back." [70-9] at 2, [70-10] at 2. One Chancellor said that native imagery is "antithetical" to the University's goals. [70-12] at 9. Another Chancellor said that images like those in the Chief Logo "are not part of this university." [70-13] at 5. And a university spokesman said that there's a "recognition by trustees that the Chief tradition has ended." [70-11] at 3.

B.  **Procedural History**

Plaintiffs filed the original complaint on December 7, 2021, [1], and have since filed three amended complaints, [25], [35], [65]. The Third Amended Complaint, which is the operative complaint in the case and was filed on October 21, 2022, also added Sportswear as a defendant. In response, Defendant Vintage Brand filed a partial motion for summary judgment on its affirmative defense and counterclaim of abandonment. [68].[2] For the reasons stated below, the Court denies Vintage Brand's partial motion for summary judgment, [68].

II.  **Legal Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists if, given the evidence, a fact finder could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is the burden of the party seeking summary judgment to show that there is no such genuine dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In evaluating a motion for summary judgment, this Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *See Hnin v. TOA (USA), LLC*, 751 F.3d 499, 503–04 (7th Cir. 2014). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial."

---

[2] Defendants both filed their respective answers, counterclaims, and affirmative defenses on November 15, 2022, [75], [76]. On November 25, 2022, Plaintiff filed a motion to compel production of documents, [85], and on December 26, 2022, it filed a motion to strike certain affirmative defenses, [93]. The Court will consider these two motions in a separate order.

*Anderson*, 477 U.S. at 255. In doing so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

### III. Analysis

Vintage Brand moves for summary judgment as to one of its affirmative defenses, arguing that the undisputed facts establish that Plaintiff abandoned the Chief Logo mark when it disavowed the mark as a symbol of the university in 2007. Plaintiff responds that it did not abandon the mark because it maintained the College Vault Program.

Abandonment of a mark is an affirmative defense to an infringement action. *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1214 (7th Cir. 1997) (citing *Sands, Taylor & Wood v. Quaker Oats Co.*, 978 F.2d 947, 954–55 (7th Cir. 1992)). A trademark is abandoned if "its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. "Nonuse for 3 consecutive years" serves as "prima facie evidence of abandonment." *Id.* This prima facie evidence can be rebutted "with evidence excusing the nonuse or demonstrating an intent to resume use." *Specht v. Google Inc.*, 747 F.3d 929, 934 (7th Cir. 2014) (citing *Sands, Taylor & Wood*, 978 F.2d at 955). The use of a mark means "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. To qualify as "bona fide use," the use must "pertain to the sale of goods or provision of services." *Specht*, 747 F.3d at 934.

Plaintiff has licensed the Chief Logo since mid-2007 exclusively through the College Vault Program and presents no evidence or argument that it has sold any products with the Chief Logo mark since 2010 outside its College Vault Program licensing. [107] ¶ 36. Therefore, if the undisputed facts establish as a matter of law that the program does not qualify as bona fide use of the Chief Logo, then Plaintiff's nonuse of the Chief Logo since at least 2010 constitutes "prima facie evidence of abandonment." 15 U.S.C. § 1127. On the other hand, if the undisputed facts establish as a matter of law that the program qualifies as bona fide use, then Vintage Brand's affirmative defense fails as a matter of law because discontinued use of the mark is an essential element for an abandonment defense. *Id.* Finally, if there remains a material disputed issue of fact about whether the program qualifies as bona fide use, then Vintage Brand's motion for summary judgment on this basis fails, but its affirmative defense remains viable for later resolution.

A.  **Whether the University's College Vault Program Qualifies as "Source-Identifying" Use of the Chief Logo**

Vintage Brand argues that the College Vault Program is not a bona fide use of the Chief Logo because the logo is not used in Vault products as a source-identifying manner, but rather, is merely ornamental. To be a trademark, a symbol like the Chief Logo must be used to "identify and distinguish" the source's "goods from those of others and to indicate the source of the goods." 15 U.S.C. § 1127; *see also Sorensen v. WD-40 Co.*, 792 F.3d 712, 722–23 (7th Cir. 2015).

Courts have found that logos, symbols, and even colors associated with a sports team on merchandise are source-identifying. In a recent trademark infringement

case brought against Vintage Brand by a different university, and on which Vintage Brand relies here, the district court noted, in dicta, two approaches courts have taken to determine if use of a mark by a sports team on merchandise qualifies as "source-identifying." *See Pa. State Univ. v. Vintage Brand, LLC*, No. 4:21-CV-01091, 2022 WL 2760233, at *4–6 (M.D. Pa. July 14, 2022). In the first approach, courts find that a mark associated with a sports team is *per se* source-identifying "because of the mental association it creates" for consumers "between the trademark and trademark holder." *See id.* at *4 (citing *Boston Pro. Hockey Ass'n v. Dallas Cap & Emblem Mfg.*, 510 F.2d 1004, 1012 (5th Cir. 1975)). Under this approach, the Chief Logo would be found source-identifying "with no need to undertake a fact-intensive inquiry into whether consumers believed the trademark holder had manufactured or sponsored the product." *Id.* (citing *Boston Pro. Hockey*, 510 F.2d at 1012).

Under the second approach, courts will only find marks to qualify as source-identifying if consumers "believe that the trademark indicates that the trademark holder is the source, sponsor, or is otherwise affiliated with the good." *See id.* at *5 (citing *Supreme Assembly, Order of Rainbow for Girls v. J. H. Ray Jewelry Co.*, 676 F.2d 1079, 1085 (5th Cir. 1982)). This is a "question of fact" and requires evaluation of consumer and public perceptions of the mark. *Id.*

While other courts have not recognized this formal departmentalization of approaches, many courts engage in a similar analysis of consumer perception of logos associated with a school in determining whether it is source-identifying. *See Savannah Coll. of Art & Design v. Sportswear, Inc.*, 983 F.3d 1273, 1285 (11th Cir.

2020) ("The very nature of school memorabilia relies upon the goodwill, reputation, and affiliation people associate with that school."). For example, the Fifth Circuit, in *Board of Supervisors for Louisiana State University Agricultural & Mechanical College v. Smack Apparel Co.*, found that a team's colors were source-indicative when combined with other indicia of the University because the "desire by consumers to associate with a particular university" drives the purchase of such apparel, and so "fans perceive the university as the source or sponsor of the goods." 550 F.3d 465, 477–78 (5th Cir. 2008).

Here, the Court finds that there remains a genuine and material factual dispute over whether the Chief Logo is used in a source-indicative manner in College Vault-licensed products. Vintage Brand argues that Plaintiff's disavowal of the Chief Logo as a symbol of the University means that the Chief Logo cannot be used in a source-identifying manner. In particular, it cites the Board's March 13, 2007 resolution and successive statements by University officials disavowing the mark as a representation of the University's athletic teams. [69] at 8–9; [70] ¶¶ 5–8. But, as the court found in *Savannah College of Art & Design*, a mark may remain source-identifying even if the trademark holder publicly disavows the mark. 983 F.3d at 1288. Instead, the inquiry focuses on how the public, generally, or consumer, specifically, views the mark at the time of the alleged infringement.

Vintage Brand relies upon cases in which a court found that a trademark holder's disavowal of a mark indicated a lack of intent to resume use of it. *See MB Fin. Bank, N.A. v. MB Real Estate Servs., LLC*, No. 02-C-5925, 2003 WL 21462501,

at *24–25 (N.D. Ill. June 23, 2003) (citing *Hiland Potato Chip Co. v. Culbro Snack Foods*, 720 F.2d 981, 983 (8th Cir. 1983)) (finding intent to abandon—but not actual abandonment—of mark post-merger where internal memos instructed employees to not use mark and public memos suggested it was unrepresentative of company post-merger).  True, disavowal may suggest no *future* intent to use a mark; this, in turn, may prove factually dispositive when a trademark holder has wholly stopped using a mark but argues that it intends to resume use in the future.  Here, however, the University continued to use the mark through its licensing program after it publicly disavowed it.  Accordingly, Vintage Brand's cited cases prove inapposite.

The parties also dispute the import of disavowals by university officials.  Plaintiff argues that such statements do not speak to whether the University would disavow the trademark rights to the Chief Logo and that such statements refer only to the use of the Chief Logo in connection with the University's athletics.  [107] ¶ 8.  Instead, Plaintiff argues that whether the University's licensing program qualifies as source-identifying turns upon a number of disputed facts.  For example, licensed Chief Logo products are sold alongside indicia of the University such as product descriptions referring to the University and statements that the products are officially licensed; as in *Smack Apparel*, the combination of such indicia is thus source-indicative. [108-7]; [108] ¶ 10.

Vintage Brand disputes that these indicia are sufficient to establish source-identification because the "the relevant consuming public knows that the University publicly disavowed and ceased use of the Chief Logo long ago." [113] ¶ 10.  But the

parties dispute both whether the relevant consuming public knows that the University apparently disavowed and ceased its use of the Chief Logo and whether the University's use is part of its relevant brand identity projected onto the consuming public. *See id.* ¶ 46; [108] ¶ 25; [113] ¶ 25. Vintage Brand points to discrete statements made by former students, community members, and University employees displaying ignorance of Plaintiff's continued licensing of the Chief Logo. [70] ¶ 46. But Plaintiff responds with public reports that criticize its licensure program, indicating public awareness of the Chief Logo's continued connection to the University. [108] ¶ 25.

The parties also dispute whether the University's current "brand identity" includes the Chief Logo. Vintage Brand points to the University of Illinois Athletics Brand Identity Guidelines, which omit any discussion of the Chief Logo. [70] ¶¶ 10–11. But Plaintiff counters that these guidelines do not establish the University's official identifiers and do not relate to the licensing of apparel and merchandise, for which Plaintiff uses the Chief Logo. [107] ¶¶ 10–11. Plaintiff argues that its licensing activities inform the University's current "brand identity" as much as, if not more, than the guidelines Vintage Brand offers as evidence. *Id.*

Overall, on the current factual record—which remains largely undeveloped because the parties have not yet completed discovery—Vintage Brand has not

established, as a matter of law, that Plaintiff's trademark program qualifies as merely "ornamental" as opposed to "source-identifying."[3]

## B. Whether the College Vault Program Constitutes a Trademark Maintenance Program

Next, Vintage Brand argues that the College Vault Program does not qualify as bona fide use because the undisputed facts establish that it remains merely a "trademark maintenance program." [69] at 9–13. Courts define a "trademark maintenance program" as a use intended "merely to reserve a right" of bona fide use in the future. *Perry v. H.J. Heinz Co. Brands, L.L.C.*, 994 F.3d 466, 474 (5th Cir. 2021). Such use does not suffice to establish bona fide use. *See id.*

Whether a particular use constitutes a "trademark maintenance program" depends upon the specifics of the use. Courts have held, however, that a key feature of "trademark maintenance programs" is whether a holder only uses the mark in connection with other products. For example, in *Exxon v. Humble*, a case cited by Vintage Brand, Exxon only attached an acquired mark to select Exxon products and invoices sent to a small number of customers. 695 F.2d 96, 98–100 (5th Cir. 1983). The court found that this did not qualify as a bona fide use because the mark "was not used to identify the source of the goods," nor did the sale of the goods depend upon the mark "for identification of source." *Id.* Rather, consumers had purchased the products in order to receive Exxon products, not products associated with the acquired mark. *Id.* at 100.

---

[3] Plaintiff also argues that Vintage Brand is prohibited from attacking the Chief Logo as being merely ornamental because it is an incontestable trademark under 15 U.S.C. §§ 1064(3), 1065. [120] at 2–3. Given its disposition of this case, the Court need not decide this issue here.

Similarly, in *Procter & Gamble Co. v. Johnson & Johnson Inc.*, P&G implemented a "minor brands" program in which it annually affixed labels from acquired minor brands to fifty units of another active P&G product. P&G's published materials made no other reference to these minor brands. 485 F. Supp. 1185, 1204–06 (S.D.N.Y. 1980). The court found that, because P&G did not place the minor brands themselves on the market in a meaningful way, their use constituted a trademark maintenance program. *Id.* at 1206–07.

On the other hand, in *Perry v. H.J. Heinz Co. Brands, L.L.C.*, the court found that the plaintiff's use of a mark was bona fide and not a trademark maintenance program even though the plaintiff sold less than 100 products with the mark, made "next to no effort to grow the sales" of the product associated with the mark, and had no products on hand. 994 F.3d 466, 474 (5th Cir. 2021). The court held that, "in the absence of definitive proof of a trademark maintenance program," like the token or sporadic use in *Exxon*, the question of whether the use was bona fide will turn on the party's "intent and credibility," issues rarely discernible on summary judgment. *Id.* at 476.

Vintage Brand has not established as a matter of law that the College Vault Program constitutes a trademark maintenance program. Instead, the evidence indicates, at least at this stage, a material dispute of fact as to whether the College Vault Program qualifies as a trademark maintenance program. For example, unlike in *Exxon* and *Procter & Gamble*, Plaintiff presents evidence that consumers may continue to purchase Chief Logo products because of the logo itself, knowing or

believing that the University is the source. [108] ¶¶ 17, 25. Further, unlike in *Procter & Gamble*, Plaintiff (through its licensees) places the Chief Logo on products in a meaningful way—they are displayed online such that potential purchasers know, when purchasing them, that they are purchasing a good with the Chief Logo affixed. [108] ¶ 10. And as discussed above, material disputes remain concerning Plaintiff's "intent and credibility," *Perry*, 994 F.3d, at 474: Plaintiff disputes that its brand identity does not include the Chief Logo and that University statements disavowing the Chief Logo indicate an intent to discontinue its use as a representation of the University, [107] ¶¶ 8, 10–11.

Vintage Brand disagrees, arguing that Plaintiff's limitations on College Vault licensees' methods of sale show that Plaintiff "invests in concealing itself" as the source of Chief Logo products. But just because Plaintiff restricts who may license the product and places limitations on those licenses does not necessarily mean that the University has concealed itself as the source or that its licensing program constitutes a trademark maintenance program. Instead, as discussed above, that determination ultimately still turns on what the public knew or believed about the source. Since the record does not resolve this material factual issue, Vintage Brand has not demonstrated an entitlement to judgment as a matter of law on its abandonment defense.

C.   Whether Sales Volume Shows Prima Facie Abandonment

Finally, Vintage Brand argues that the College Vault Program's de minimis sales revenue establishes as a matter of law that it does not qualify as bona fide use of the Chief Logo.

In some circumstances de minimis use can indicate that a party is not using a mark in a bona fide manner. *See S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 835 F.3d 660, 668–69 (7th Cir. 2016) (citing *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 146 F.3d 350, 359 (6th Cir. 1998)). But low sales numbers, on their own, do not necessarily preclude bona fide use. *Id.* In *S.C. Johnson*, the Seventh Circuit found that despite "low sales," plaintiff's use was bona fide because it continued to manufacture and sell products with the mark through a publicly-available website and at retail shops. *Id.* (citing *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1196 (11th Cir. 2001)).

Thus, sales volume remains just one factor in the determination of whether the seller intends "to reserve a mark for later use, rather than the present commercial utilization of the mark." *Id.* (quoting *Allard Enterprises*, 146 F.3d at 359). Indeed, *Perry*, *Exxon*, and *Procter & Gamble* all involved annual sales of fewer than 100 products of the marks at issue. And while the *Exxon* and *Procter & Gamble* courts found such low sales, combined with the non-source identifying nature of both products sold, demonstrated abandonment, 695 F.2d at 100; 485 F. Supp. at 1206, the *Perry* court found just the opposite. *See Perry,* 994 F.3d at 476 (low sales numbers are not "definitive proof of a trademark maintenance program"). As in *Perry*, issues

of fact remain as to whether the College Vault Program constitutes a trademark maintenance program.

In fact, the record remains disputed as to whether the sales involved in this case can even be described as de minimis. College Vault Program licensees have still sold over 27,000 licensed Chief Logo products over the past decade, which significantly exceeds the *de minimis* sales in *Exxon* and *Procter & Gamble*. 695 F.2d at 100; 485 F. Supp. at 1206. Further, as in *S.C. Johnson*, College Vault licensees manufacture goods with the Chief Logo and sell them online with the mark and its origin clearly indicated. 885 F.3d at 669. Chief Logo products may not be sold in retail stores (as the products were in *S.C. Johnson)*, but the online sales remain significant and material to the issue of bona fide use. *Id.*

Vintage Brand acknowledges that the volume of sales remains higher than in some other cases that found *de minimis* use but insists that the Chief Logo sales still qualify as *de minimis* because they represent such a small part of Plaintiff's overall licensing revenue. But Vintage Brand cites no legal authority that *de minimis* use turns on the volume of sales of products containing the mark relative to overall sales of all products. To the contrary, *S.C. Johnson* forecloses such a simplistic test.

The record before the Court does not establish as a matter of law that the University abandoned the Chief Logo. Instead, and unsurprisingly since discovery has not yet closed, the record leaves unanswered material factual questions as to whether the College Vault Program qualifies as a bona fide use of the Chief Logo.

The Court thus denies without prejudice Vintage Brand's motion for partial summary judgment on its abandonment affirmative defense.[4]

## IV. Conclusion

For the reasons stated above, the Court denies Vintage Brand's motion for partial summary judgment without prejudice, [68].

Dated: September 29, 2023

Entered:

_____
John Robert Blakey
United States District Judge

---

[4] Plaintiff also refers to and answers Vintage Brand's affirmative defense of acquiescence. [106] at 14. But Vintage Brand does not argue this defense in any of its filings related to this motion. *See* [69], [112]. Thus, the Court does not consider it at this time.